IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No.  10-34074 |
| PEARVILLE, L.P. | § | |
| | § | Chapter 11 |
| Debtor. | § | |

## SECOND AMENDED JOINT DISCLOSURE STATEMENT
## OF THE DEBTOR AND LVH PEARVILLE LLC
### (November 23, 2010)

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE CHAPTER 11 PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THERE WILL BE A HEARING ON THIS DISCLOSURE STATEMENT TO DETERMINE IF IT PROVIDES ADEQUATE INFORMATION. IF THE DISCLOSURE STATEMENT IS APPROVED BY THE BANKRUPTCY COURT, THERE WILL BE A SUBSEQUENT HEARING TO CONSIDER CONFIRMATION OF THE PLAN. ALL CREDITORS AND EQUITY INTEREST HOLDERS WILL BE NOTIFIED OF THE DATE OF SUCH CONFIRMATION HEARING.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

## <u>EXHIBITS TO DISCLOSURE STATEMENT</u>

EXHIBIT D-1              CHAPTER 11 PLAN OF REORGANIZATION

EXHIBIT D-2              PARTNERSHIP STRUCTURE

EXHIBIT D-3              IBC SETTLEMENT TERM SHEET

EXHIBIT D-4              EXECUTORY CONTRACTS

EXHIBIT D-5              INSIDER PAYMENTS

## I. DEFINITIONS AND RULES OF CONSTRUCTION

This Disclosure Statement incorporates the Definitions and Rules of Construction stated in the Chapter 11 Plan filed contemporaneously herewith and as amended.

## II. INTRODUCTION

Pearville, L.P. referred to as the "Debtor", or on and after the Effective Date of the Plan, the "Reorganized Debtor", has filed a Chapter 11 Plan of Reorganization (the "Plan").  The Plan is jointly proposed by the Debtor and LVH Pearville, LLC (herein, "LVH Pearville," and together with the Debtor, the "Plan Proponents").   The Plan is attached to this Disclosure Statement as **EXHIBIT D-1**.   The Plan Proponents submit this Disclosure Statement (this "Disclosure Statement"), pursuant to Section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), to holders of Claims against and Interests in the Debtor, in connection with (i) the solicitation of acceptances or rejections of the Plan (together with any modification, amendment or supplement, of the Plan), and (ii) the hearings to consider approval of the Plan to be scheduled before the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") on the date(s) set forth in the accompanying notice.

In the event of a conflict or difference between the definitions used, and provisions contained, in this Disclosure Statement and the Plan, the definitions and provisions contained in the Plan shall control.

**NEITHER THE DEBTOR, LVH PEARVILLE, LLC, NOR THEIR COUNSEL, ARE ABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.   EXCEPT AS SPECIFICALLY NOTED, THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, ALTHOUGH THERE IS NO ACTUAL KNOWLEDGE OF ANY INACCURACY.   THE**

FACTUAL INFORMATION REGARDING THE DEBTOR, INCLUDING THE ASSETS AND LIABILITIES OF THE DEBTOR HAS BEEN DERIVED FROM NUMEROUS SOURCES, INCLUDING, BUT NOT LIMITED TO DEBTOR'S BOOKS AND RECORDS, PROOFS OF CLAIM FILED IN THIS CASE, THE DEBTOR'S SCHEDULES, PLEADINGS AND REPORTS ON FILE WITH THE COURT, LOAN AGREEMENTS AND BUSINESS RECORDS AND DOCUMENTS SPECIFICALLY IDENTIFIED HEREIN.

## III. PURPOSE AND SUMMARY OF THE PLAN

THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY.   HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW AND ANALYZE THE PLAN IN ITS ENTIRETY.

The primary purpose of the Plan is to satisfy the claims against the Debtor through payment pursuant to the terms of the Plan and to restructure the Debtor's equity ownership.

## IV. SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN

### A.   TREATMENT OF CLAIMS AND INTERESTS

The Plan contemplates that LVH Pearville shall provide the Exit Financing to the Debtor on the Effective Date in an amount sufficient to (i) provide additional operating capital for the Reorganized Debtor; (ii) fund the cure payments for executory contracts and leases to be assumed by the Reorganized Debtor; and (iii) fund the payments to the following Allowed Claims:   Administrative Expense Claims, Priority Tax Claims, and Class 3 Claims.   The proposed payments for the Class 1 and 4 Claims shall be paid by the Reorganized Debtor pursuant to the terms described herein.   In exchange for providing the Exit Financing, LVH

Pearville, LLC, shall (i) receive 100% of the equity interest in the Reorganized Debtor; and (ii) receive a lien on all of the Reorganized Debtor's assets to secure the amount of the Exit Financing as well as any future cash infusions necessary to fund cash flow deficiencies until the project is able to generate a positive cash flow.  On the Effective Date, the Debtor, now a limited partnership, shall be converted to a limited liability company.

**B.     CLAIMS AND INTERESTS UNDER THE PLAN**

The following is a summary of the classification and treatment of Claims and Interests under the Plan:

| CLASS | TREATMENT |
|---|---|
| Unclassified.  Allowed Administrative Expense Claims. | Unimpaired.  Not entitled to vote.<br><br>Administrative Expense Claims shall be satisfied in the following manner:<br><br>Subject to the bar date provisions herein, each holder of an Allowed Administrative Claim against the Debtor shall be paid on account of and in full satisfaction of such Allowed Administrative Claim, cash equal to the amount of the Allowed Administrative Claim, on the later of: (a) the Effective Date, or (b) the date such Administrative Claim becomes an Allowed Administrative Claim, or, in either case, as soon thereafter as is practicable.  The Exit Financing shall be the source of the Cash used to pay Allowed Administrative Claims.<br><br>On or before the Effective Date, the Debtor shall pay all fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, in Cash in full.<br><br>Except as provided below for professionals and non-tax liabilities incurred in the ordinary course of business by the Debtor in Possession, requests for payment of Administrative Claims must be Filed no later than thirty (30) days after the Effective Date.  Holders of Administrative Claims (including, without limitation, any governmental units asserting claims for federal, state, or local taxes) that are required to File a request for payment of such Claims and that do not File such requests by such bar date shall be forever barred from asserting such claims against the Debtor, Reorganized Debtor, any other person or entity, or any of their respective property.<br><br>Holders of Allowed Administrative Claims shall not be entitled to interest on their Administrative Claims.<br><br>All professionals or other entities requesting compensation or reimbursement of expenses under sections 327, 328, 330, 331, 503(b), 506 and 1103 of the Bankruptcy Code for services rendered before the Effective |

| | |
|---|---|
| | Date (including any compensation requested by any professional for any other entity for making a substantial contribution in the Reorganization Case or under any Bankruptcy Code section) shall File and serve on the Reorganized Debtor an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date.<br><br>Holders of Administrative Claims based on liabilities incurred in the ordinary course of business of the Debtor in Possession prior to the Effective Date (other than professionals or other entities described above, and governmental units that hold claims for taxes or claims and/or penalties related to such taxes) shall not be required to File any request for payment of such claims.  Such Administrative Claims shall be assumed and paid by the Reorganized Debtor in the ordinary course of business under the terms and conditions of the particular transaction giving rise to such Administrative Claim, without any further action by the holders of such claims.<br><br>Estimated percentage recovery: 100% |
| **Unclassified: Allowed Priority Tax Claims.** | Unimpaired.  Not entitled to vote.<br><br>To the extent such Claim exists, each holder of an Allowed Priority Tax Claim shall receive one of the following two treatments, as determined by the Debtor in its sole and absolute discretion, on account of and in full satisfaction of such Allowed Priority Tax Claim: (a) Cash on the Effective Date, or on such other date on which such Priority Tax Claim becomes an Allowed Claim, in an amount equal to the amount of the Allowed Priority Tax Claim or (b) equal monthly payments over sixty (60) months with interest at the rate required by 11 U.S.C. §511.  Holders of Priority Tax Claims will not receive any payment on account of penalties with respect to or arising in connection with, such Priority Tax Claims.<br><br>Estimated percentage recovery:  100% |
| **Class 1.  Secured Claim Portion of IBC $8.4 Million Note.**<br><br>Claim Amount:<br>$7,776,000.00 | Impaired. Entitled to vote.<br><br>On or before the Effective Date, Van Hessen shall purchase the IBC $8.4 Million Note and take an assignment of said note in addition to any other rights/agreements ancillary to the $8.4 Million Note (e.g. assignment of rents, guaranty agreements).<br><br>The Class 1 Claim shall be satisfied in the following manner:<br><br>    i.   *Capitalization*.  On the Effective Date, the Class 1 Claim shall be capitalized as the Class 1 Claim Note with a principal amount of $7,776,000.00.<br><br>    ii.   *Interest Rate*.  The Class 1 Claim Note shall bear interest at the New York Prime Rate plus 1.50% with a floor of 5.75% per annum.<br><br>    iii.   *Term and Amortization*.  Payments of interest only shall be made in equal payments commencing on January 31, 2011 for a period of 12 months.  The Class 1 Claim Note shall be paid in full or |

| | |
|---|---|
| | refinanced on January 31, 2012.<br><br>iv. _Collateral_. The holder of the Class 1 Claim Note shall retain all of the lien and security interests in the IBC Collateral, with the same priority that existed on the Petition Date.<br><br>Estimated percentage recovery: 100% |
| **Class 2. IBC $7.6 Million Note.**<br><br>Claim Amount:<br>$550,804.14 | Impaired. Entitled to vote.<br><br>Upon receipt of the Settlement Payment and a full and final release of the T&S Litigation, IBC shall (i) cancel any and all indebtedness and otherwise discharge the IBC $7.6 Million Note; and (ii) release any and all liens encumbering the PAD Sites. Accordingly, there will be no payment by the Debtor under this Plan to the holder of the Class 2 Claim.<br><br>Estimated percentage recovery: 100% |
| **Class 3. General Unsecured Claims**<br><br>Estimated Claims: $ TBD | Impaired. Entitled to Vote.<br><br>Each holder of an Allowed Class 3 Claim shall be paid its pro rata share of the Class 3 Claim Consideration ($50,000.00) on the later of: (a) ninety (90) days after the Effective Date; or (b) the date such Class 3 Claim becomes an Allowed Claim.<br><br>Any default interest, late fees, legal fees, or other contractual penalties shall be deemed waived as of the Effective Date. Holders of Class 3 Claims will not receive interest on the unpaid balance of their Class 3 Claims. The Exit Financing shall be the source of the Cash used to pay the Class 3 Claim.<br><br>Estimated percentage recovery: TBD% |
| **Class 4. Consolidated Van Hessen Claim**<br><br>Estimated Claim:<br>$ 3,848125.94<br><br>Comprised of:<br><br>IBC Deficiency Claim: $ 1,625,143.35<br>Van Hessen Claim: $1,712,502.65<br>T&S Claim: $510,479.94 | Impaired. Entitled to vote.<br><br>The holder of the Class 4 Claim has elected to subordinate its claim to the other General Unsecured Creditors. The Class 4 Claim shall be satisfied in the following manner:<br><br>i. _Capitalization_. On the Effective Date, the Class 4 Claim shall consolidated and capitalized as the Class 4 Claim Note with a principal amount of $3,848,125.94.<br><br>ii. _Interest Rate_. The Class 4 Claim Note shall bear interest at the New York Prime Rate plus 1.50% with a floor of 5.75% per annum.<br><br>iii. _Term and Amortization_. Payments of interest only shall be made in equal payments commencing on January 31, 2011 for a period of 12 months. Thereafter, the Class 4 Claim Note shall be amortized over a sixty month (five year) period.<br><br>iv. _Collateral_. The Class 4 Claim Note is not secured by any collateral in the Debtor or Reorganized Debtor's assets. |

| | Estimated percentage recovery: TBD% |
|---|---|
| **Class 5: Partnership Interests.** | Impaired. Deemed to Reject the Plan. |
| | The holders of Partnership Interests in the Debtor shall surrender their Partnership Interests. |
| | Estimated percentage recovery: 0% |

The Claims and Claim amounts listed above are amounts estimated by the Debtor as of the filing of this Disclosure Statement and all such Claims are still being reviewed by the Debtor. A listing of Claims or any amounts with respect thereto above or elsewhere in this Disclosure Statement shall not constitute, or be deemed to constitute, allowance of such Claims and all such Claims and amounts are subject, and will remain subject, to challenge and objection by the Debtor and the Reorganized Debtor prior to voting on the Plan and at any time thereafter as provided in the Plan unless such Claim is specifically resolved in the Plan or the Term Sheet.

## V. GENERAL OVERVIEW AND BACKGROUND INFORMATION

### A.    BACKGROUND, GENERAL INFORMATION AND EVENTS LEADING TO THE CHAPTER 11 CASE

The Debtor is a Texas limited partnership.  JEFCO Development Corporation ("JEFCO") and Maverick Real Estate Investments, LLC, each own a 50% Partnership Interest in the Debtor. JEFCO is the general partner and manager of the Debtor.   (See **EXHIBIT D-2**: Partnership Structure.)  The Debtor was formed to design, develop, construct and market a master planned development in Houston, Texas (the "Pearville Project").  Prior to the Petition Date, the Debtor completed construction on a shopping center known as The Parks at Boulder Creek.

To finance the Pearville Project, the Debtor sought financing first from IBC.  From August 2004 through September 2006, the Debtor borrowed approximately $20,710,766.00 from IBC in four separate loan transactions.  In addition to funding construction for the shopping center, these funds were used principally to purchase land and bring utilities to the Pearville

Project site, including construction of an offsite sanitary sewer and water line, a lift station and a water detention pond. Completing these utility projects was essential to allow the Debtor to further develop and market the Pearville Project.

As part of the utilities project, the Debtor allowed a portion of the land for the Pearville Project to be annexed by Municipal Utilities District No. 381 ("MUD-381"). As part of that arrangement, the Debtor and MUD-381 entered into certain agreements whereby the Debtor would fund the utilities project and get reimbursed for the development over time from the MUD-381 (the "MUD-381 Receivable"). On its Schedules, the Debtor estimates the value of the MUD-381 Receivable at $1,000,000.00 due to the Debtor in the near future. This portion of the MUD-381 Receivable is subject to competing lien and/or security interest claims by IBC, Van Hessen, Troy Construction LLC and Peltier Brothers Construction, L.P.

The original timeline for the Shopping Center's construction was nine (9) months for the hard-shell of the Shopping Center and an additional four (4) months for the build-out of the tenant spaces. However, due to a myriad of unforeseen factors, both the cost and timeline to complete the project escalated out of control. In 2008, Shopping Center construction site was damaged by Hurricane Ike, which caused additional delays and costs to repair the damage. Moreover, the City of Houston delayed issuing necessary permits for over a year while a new sanitary waste lift station was being built.

The Debtor also experienced significant problems with Brewer & Escalante Associates, Inc. ("Brewer") which was the civil engineering firm for the utilities construction. The Debtor has commenced litigation against Brewer for, among other claims, negligence, professional negligence, negligent misrepresentation, breach of fiduciary duty, and breach of contract. This

action is currently pending in the 280th Judicial District, Harris County, Texas, and is listed as Case No. 2009-04632.

Because of skyrocketing construction costs and delays, the Debtor needed additional financing to complete construction on the Shopping Center. Unable to secure additional funds from IBC, in October 2008, the Debtor borrowed $4,000,000.00 from Van Hessen. The proceeds from the Van Hessen Loan were used to pay for cost overages on the utilities, hurricane damages, and other cost overages, including firing the original civil engineer (Brewer) and hiring a replacement to complete the utilities aspect of the project. The estimated balance of the Van Hessen loan is $1,750,000.

Contemporaneous, with the funding of the Van Hessen Loan, the national and global financial markets began collapsing, which drastically curtailed the Debtor's ability to lease the tenant space in the Shopping Center and reduced the rent rates being charged for the space that the Debtor was able to lease. As of the Petition Date, 19,525 of the 53,754 available square feet of the Shopping Center were leased to a total of six tenants. The combined effect of lower rental and occupancy rates, construction cost overages, and other delays resulted in the Debtor not having sufficient funds to pay all of its expenses, including amounts due for continued construction and debt service obligations. Accordingly, the shopping center was posted for non-judicial foreclosure by IBC in both May and June 2010.

Despite the Debtor's efforts over the months leading to the commencement of these bankruptcy proceedings, the Debtor was unable to secure additional financing and/or modification of its current debt service obligations. Accordingly, on May 14, 2010, the Debtor voluntarily commenced this Chapter 11 case to protect its assets and to reorganize its business.

## B.  THE DEBTOR'S DEBT STRUCTURE

The Debtor's Debt Structure is as follows:

- International Bank of Commerce—approximately $8,900,000.00 principal balance
- J.A. "Lex" Van Hessen—approximately $1,300,000 principal balance
- Materialmens Lien Claims—approximately $988,031, which excludes the over-lapping claims of sub-contractors
- General Unsecured Claims—approximately $287,931 as scheduled on the Debtors' Amended Schedules

## C.  THE DEBTOR'S ASSETS

The Debtor's primary asset—the Parks at Boulder Creek retail center has been appraised at a current value of $7,400,000.00.  IBC holds a first lien on the Parks at Boulder Creek retail center.  The Debtor also owns a parcel of land adjacent to the Parks at Boulder Creek retail center, which contains a detention pond valued at $200,000.00 for tax purposes.  IBC holds a first lien on this detention pond property.  The Debtor's other assets include: (1) the MUD-381 Receivable; (2) litigation claims against Brewer & Escalante; (3) cash on hand; and (4) some office furnishings.

## D.  SIGNIFICANT POST-PETITION EVENTS

Since the Petition Date, the Debtor has continued to operate its business and manage its properties as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### 1.  Continuation of Business; Stay of Litigation.

The Bankruptcy Court has certain supervisory powers over the Debtor's operations during the pendency of the Chapter 11 Case, including the power to approve any transactions that are outside the ordinary course of the Debtor's business.

An immediate effect of the filing of a bankruptcy case is the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all litigation against the Debtor. This injunction will remain in effect until the Effective Date unless modified or lifted by order of the Bankruptcy Court.

### 2.      First Day Pleadings.

Following the filing of the Petition, the Debtor filed, among other pleadings, the following "first day pleadings" with the Bankruptcy Court:

> (a)      Emergency Motion for Entry of Order Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001 for Interim and Final Orders: (1) Authorizing Use of Cash Collateral; (2) Directing Payment of Rents to the Debtor; (3) Granting Adequate Protection; (4) Scheduling and Approving the Form and Method of Notice for a Final Order; and (5) for Related Relief (the "Cash Collateral Motion");

> (b)      Emergency Motion for Interim and Final Orders: (1) Prohibiting Utilities from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtor on Account of Prepetition Amounts Due; (2) Determining that the Utilities are Adequately Assured of Future Payment; (3) Establishing Procedures for Determining Requests for Additional Assurance; and (D) Permitting Utility Companies to Opt-Out of the Procedures Established Herein (the "Utilities Motion"); and

> (c)      Application by Debtor for Entry of an Order Authorizing the Employment and Retention of Spencer Crain Cubbage Healy & McNamara, pllc (the "Application to Retain Spencer Crain"); and

*Cash Collateral Motion.* On May 27, 2010, the Court convened an interim hearing on the Cash Collateral Motion. At that time, the parties reached an informal oral agreement regarding interim use of cash collateral. On June 22, 2010, the Court convened a second interim hearing on the Cash Collateral Motion, which resulted in a second agreed interim order (the "Second Interim Order"). On August 17, 2010, the Court entered a final order authorizing the use of cash collateral (the "Final Order").

*Utilities Motion*.  On June 9, 2010, the Court convened a hearing on the Utilities Motion and entered an order granting the motion on June 11, 2010.  There were no objections raised against the Utilities Motion.

*Application to Retain Spencer Crain*.  On May 18, 2010, the Court entered an order granting the Debtor's Application to Retain Spencer Crain as its bankruptcy Counsel.

*Application to Retain David Montgomery*.  On July 12, 2010, the Court entered an order granting the Debtor's Application to Retain David Montgomery as special real estate counsel to the Debtor.

*Application to Retain Brian Rogers*.  On July 12, 2010, the Court entered an order granting the Debtor's Application to Retain Brian Rogers as the Debtor's accounting services professional.

### 3.   Compliance with Bankruptcy Code, Bankruptcy Rules, Local Court Rules, and U.S. Trustee Deadlines.

On June 11, 2010, the Debtor filed (and later amended) its Statement of Financial Affairs, Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Lists of Equity Security Holders.

Pursuant to section 341 of the Bankruptcy Code, a meeting of creditors for the Debtor was held on June 15, 2010.

## E.   REMOVAL OF CERTAIN STATE COURT LITIGATION TO THE BANKRUPTCY COURT

IBC and the Debtor are defendants in a civil action originally filed on August 11, 2009 by Plaintiff Tribble & Stephens Constructors, Ltd. in the District Court of Harris County, 80th Judicial District of Texas, Cause No. 2009-51129, captioned *Tribble & Stephens Constructors, Ltd., v. International Bank of Commerce & Pearville, L.P.* (the "T&S Litigation").  In its Original Petition, Tribble & Stephens raise claims for breach of contract and promissory estoppel

arising from the construction services it provided to the Debtor.  Tribble & Stephens also seek a declaratory judgment and foreclosure of its mechanic's lien.  On June 17, 2010, the Debtor removed the T&S Litigation to the Bankruptcy Court.

The Debtor, its general partner (JEFCO Corporation) and James E. Fisher, Jr. (the manager of JEFCO) are defendants in a civil action originally filed on April 23, 2010, by IBC against Van Hessen (the "IBC Litigation").  On April 28, 2010, Van Hessen filed his answer and a third-party petition against the Debtor, JEFCO and Mr. Fisher.  The IBC Litigation concerns Van Hessen's foreclosure of real property previously owned by the Debtor.  On June 18, 2010, the Debtor removed the IBC Litigation to the Bankruptcy Court.

The Debtor expects that upon the Effective Date of the Plan that the T&S Litigation and IBC Litigation will become moot.

## VI. T&S AND IBC SETTLEMENTS

On November 9, 2010, the Plan Proponents and IBC reached an agreement resolving certain disputes existing between the parties.  Prior to that date, Van Hessen and T&S entered into a transaction whereby Van Hessen purchased the T&S Claim and took an assignment of that claim.  The combined result of the IBC Settlement and purchase of the T&S Claim resolves disputes regarding the IBC Claim, the T&S Claim and both of the adversary proceedings (the T&S Litigation and the IBC Litigation) pending before the Bankruptcy Court.

The IBC Settlement is memorialized in the Term Sheet which is attached hereto as **EXHIBIT D-3**.  Among its many terms, the IBC Settlement provides for the following resolution of outstanding claims and disputes:

## A.   IBC $8.4 MILLION NOTE

Pursuant to the terms of the IBC Settlement, Van Hessen will purchase the IBC $8.4 Million Note for $ 7,776,00.00 in cash.  Van Hessen will take an assignment of the IBC $8.4

Million Note and all collateral rights and agreements related thereto. As a result of the IBC Settlement, Van Hessen (or his assign) will become the holder of the Class 1 Claim described in the Plan. Van Hessen will also become the holder of the IBC Deficiency Claim, which principal balance will be consolidated with other claims held by Van Hessen into the principal balance of the Class 4 Claim Note.

**B.     T&S CLAIM AND T&S LITIGATION**

Prior to the filing of this Disclosure Statement, Van Hessen purchased the T&S Claim from T&S for cash consideration. Van Hessen has taken an assignment of the T&S Claim and now stands in the position of T&S in the T&S Litigation against the Debtor and IBC. As part of the IBC Settlement, Van Hessen was obligated to use its reasonable efforts to resolve the T&S Litigation, which it has done through the effecting the T&S Settlement. Van Hessen also agreed to deliver to IBC a full and final release of the T&S Litigation, which it shall do as part of the closing of the IBC Settlement. The combination of these actions fully resolves the T&S Litigation.

Van Hessen is now the holder of the T&S Claim. As described in the T&S Proof of Claim, the T&S Claim includes a secured claim based on T&S materialmens lien on the Debtor's property and an unsecured claim. The T&S Claim totals $510,479.94. Van Hessen has agreed to treat the entirety of the T&S Claim as an Unsecured Claim, which shall be consolidated with other claims held by Van Hessen into the principal balance of the Class 4 Claim Note.

As part of Van Hessen's purchase of the T&S Claim, T&S delivered to Van Hessen certain lien release documents for the T&S Claim and its subcontractors, several of which were listed on the Debtor's Schedule D. The following subcontractor claims listed on the Debtor's

13

Schedule D have been cancelled and otherwise discharged: Jose Ramirez Drywall, TAS Commercial Concrete Construction, LLC, Schindler Elevator Corporation, and Limeco, Inc.

**C.   IBC $7.6 MILLION NOTE AND IBC LITIGATION**

Pursuant to the terms of the IBC Settlement, IBC shall cancel and otherwise discharge the IBC $7.6 Million Note and dismiss with prejudice the IBC Litigation upon the satisfaction of certain conditions as described in the Term Sheet. Those conditions are as follows: (i) a payment of $850,000 by Van Hessen to IBC; (ii) and IBC obtaining a full and final release of the T&S Litigation (discussed at A above). Accordingly, the IBC Settlement shall fully resolve the IBC $7.6 Million Note, which is the Class 2 Claim, and the IBC Litigation.

**D.   MUTUAL RELEASES**

Pursuant to the terms of the IBC Settlement, IBC, Van Hessen, LVH Pearville, and the Debtor will enter into mutual releases in forms to be agreed upon providing a release of all claims by and between the parties and that each party shall bear its own fees and expenses, including but not limited to those fees covered by Porter & Hedges Proof of Claim.

**E.   MUD-381 BONDING CAPACITY**

Pursuant to the terms of the IBC Settlement, LVH Pearville and the Debtor have agreed to assign to IBC $2,000,000.00 of MUD-381 bonding capacity to be used on certain real property formerly owned by a non-Debtor entity (Pearville-Hope).

**VII. THE PLAN**

The Plan Proponents have proposed the Plan and believe that the classification and treatment of Claims and Partnership Interests provided for in the Plan are consistent with the requirements of the Bankruptcy Code. Under the Bankruptcy Code, holders of Allowed Claims against the Debtor that are Impaired and that receive distributions under the Plan are entitled to

14

vote on the Plan.  A summary of the classification and treatment of Claims and Interests under the Plan is set forth above in this Disclosure Statement.

## A.   EXIT FINANCING TO BE PROVIDED BY LVH PEARVILLE, LLC

The Plan contemplates that LVH Pearville shall provide the Exit Financing to the Debtor on the Effective Date in an amount sufficient to (i) provide additional operating capital for the Reorganized Debtor; (ii) fund the cure payments for executory contracts and leases to be assumed by the Reorganized Debtor; and (iii) fund the payments to the following Allowed Claims:   Administrative Expense Claims, Priority Tax Claims, and Class 3 Claims.   The proposed payments for the Class 1 and 4 Claims shall be paid by the Reorganized Debtor pursuant to the terms described herein.   In exchange for providing the Exit Financing, LVH Pearville, LLC, shall receive (i) 100% of the equity interest in the Reorganized Debtor; and (ii) a lien on all of the Reorganized Debtor's assets to secure the amount of the Exit Financing as well as any future cash infusions necessary to fund cash flow deficiencies until the project is able to generate a positive cash flow.  On the Effective Date, the Debtor, now a limited partnership, shall be converted to a limited liability company.

## B.   TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN

The Plan provides for the payment of Claims against and Interests in the Debtor, including the treatment of unclassified Claims.  The principal administrative claims known to the Debtor are the fees and expenses of the Debtor's attorneys and accountant.

### 1.   Administrative Claims.

#### a.   Generally.

Subject to the bar date provisions herein, the Reorganized Debtor shall pay each holder of an Allowed Administrative Claim against the Debtor on account of and in full satisfaction of

such Allowed Administrative Claim, Cash equal to the amount of the Allowed Administrative Claim, on the later of: (a) the Effective Date, or (b) the date such Administrative Claim becomes an Allowed Administrative Claim, or, in either case, as soon thereafter as is practicable.

**b.      Payment of Statutory Fees.**

On or before the Effective Date, the Debtor or Reorganized Debtor shall pay all fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, in Cash in full.

**c.      Bar Date For Administrative Claims.**

i.      General Provisions.

Except as provided below for professionals and non-tax liabilities incurred in the ordinary course of business by the Debtor in Possession, requests for payment of Administrative Claims must be filed no later than thirty (30) days after the Effective Date.  Holders of Administrative Claims (including, without limitation, any governmental units asserting claims for federal, state, or local taxes) that are required to File a request for payment of such Claims and that do not File such requests by such bar date shall be forever barred from asserting such claims against the Debtor, Reorganized Debtor, any other person or entity, or any of their respective property.

Holders of Allowed Administrative Claims shall not be entitled to interest on their Administrative Claims.

ii.      Professionals.

All professionals or other entities requesting compensation or reimbursement of expenses under sections 327, 328, 330, 331, 503(b), 506 and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including any compensation requested by any professional

for any other entity for making a substantial contribution in the Reorganization Case or under any Bankruptcy Code section) shall File and serve on the Reorganized Debtor an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date.

### iii.    Ordinary Course Liabilities.

Holders of Administrative Claims based on liabilities incurred in the ordinary course of business of the Debtor in Possession prior to the Effective Date (other than professionals or other entities described in subparagraph (ii) above, and governmental units that hold claims for taxes or claims and/or penalties related to such taxes) shall not be required to File any request for payment of such claims.   Such Administrative Claims shall be assumed and paid by the Reorganized Debtor in the ordinary course of business under the terms and conditions of the particular transaction giving rise to such Administrative Claim, without any further action by the holders of such claims.

### 2.    Priority Tax Claims.

To the extent such claims exist, each holder of an Allowed Priority Tax Claim shall receive one of the following two treatments, as determined by the Reorganized Debtor in its sole and absolute discretion, on account of and in full satisfaction of such Allowed Priority Tax Claim: (a) Cash on the Effective Date, or on such other date on which such Priority Tax Claim becomes an Allowed Claim, in an amount equal to the amount of the Allowed Priority Tax Claim or (b) payment in sixty equal monthly payments with interest calculated in accordance with 11 U.S.C. section 511.   Holders of Priority Tax Claims will not receive any payment on account of penalties with respect to or arising in connection with, such Priority Tax Claims.

### C.       TREATMENT OF CLASSIFIED CLAIMS UNDER THE PLAN

#### 1.       Class 1 – Secured Portion of IBC $8.4 Million Note

Pursuant to the IBC Settlement, on or before the Effective Date Van Hessen will have purchased the IBC $8.4 Million Note and taken an assignment of that note. Accordingly, the Plan contemplates that Van Hessen will be the holder of the Class 1 Claim.

The holder of the Class 1 Claim is entitled to vote. The Class 1 Claim shall be satisfied in the following manner:

     i. *Capitalization*. On the Effective Date, the Class 1 Claim shall be capitalized as the Class 1 Claim Note with a principal amount of $7,776,000.00.

     ii. *Interest Rate*. The Class 1 Claim Note shall bear interest at the New York Prime Rate plus 1.50% with a floor of 5.75% per annum.

     iii. *Term and Amortization*. Payments of interest only shall be made in equal payments commencing on January 31, 2011 for a period of 12 months. The Class 1 Claim Note shall be paid in full or refinanced on January 31, 2012.

     iv. *Collateral*. The holder of the Class 1 Claim Note shall retain all of the lien and security interests in the IBC Collateral, with the same priority that existed on the Petition Date.

#### 2.       Class 2 – IBC $7.6 Million Note

The IBC Settlement contemplates that upon receipt of the Settlement Payment (as that term is defined in the Term Sheet) and a full and final release of the T&S Litigation, IBC shall (i) cancel any and all indebtedness and otherwise discharge the IBC $7.6 Million Note; and (ii) release any and all liens encumbering the PAD Sites. Accordingly, if the IBC $7.6 Million Note has been cancelled and otherwise discharged at the Balloting Deadline, there shall be no holder of a Class 2 Claim entitled to vote on the Plan. If however, the IBC $7.6 Million Note has not

been cancelled or otherwise discharged as of the Balloting Deadline, the holder of the Class 2 Claim holds an impaired claim and is entitled to cast a Ballot on the Plan.

### 3.    Class 3 –General Unsecured Claims

The holders of Class 3 Claims are Impaired and thus are entitled to vote.  The Class 3 Claims shall be satisfied in the following matter:

Each holder of an Allowed Class 3 Claim shall be paid its pro rata share of the Class 3 Consideration ($50,000.00) on the later of: (a) ninety (90) days after the Effective Date; or (b) the date such Class 3 Claim becomes an Allowed Claim.  Any default interest, late fees, legal fees, or other contractual penalties shall be deemed waived as of the Effective Date.  Holders of Class 3 Claims will not receive interest on the unpaid balance of their Class 3 Claims.  The Exit Financing shall be the source of the Cash used to pay the Class 3 Claim.

### 4.    Class 4 – Consolidated Van Hessen Claim

The holder of the Class 4 Claim is entitled to vote.  The Class 4 Claim shall be satisfied in the following manner:

i. *Capitalization*.  On the Effective Date, the Class 4 Claim shall consolidated and capitalized as the Class 4 Claim Note with a principal amount of $3,848,125.94.

ii. *Interest Rate*.  The Class 4 Claim Note shall bear interest at the New York Prime Rate plus 1.50% with a floor of 5.75% per annum.

iii. *Term and Amortization*.  Payments of interest only shall be made in equal payments commencing on January 31, 2011 for a period of 12 months. Thereafter, the Class 4 Claim Note shall be amortized over a sixty month (five year) period.

iv. *Collateral*.  The Class 4 Claim Note is not secured by any collateral in the Debtor or Reorganized Debtor's assets.

**5.     Class 5 - Partnership Interests**

Class 5 is impaired and is deemed to reject the Plan. The holders of Partnership Interests in the Debtor shall surrender their Partnership Interests.

**D.     MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN**

**1.     Effective Date.**

The "Effective Date" of this Plan shall be 14 days after the Confirmation Order becomes a Final Order.

**2.     Effective Date Conditions.**

Notwithstanding any other provision of this Plan, the Effective Date shall not occur until the following conditions have been either satisfied or waived by the Debtor or the Reorganized Debtor (or will be satisfied or waived contemporaneously with the occurrence of the Effective Date): (1) the Confirmation Order, in form and substance satisfactory to the Debtor or the Reorganized Debtor and LVH Pearville shall have become a Final Order and not subject to appeal; (2) the Exit Financing contemplated by the Plan which is due to have been paid on the Effective Date shall have been funded to the Debtor; and (3) the IBC Settlement obligations have been fulfilled.

**3.     Notice of Occurrence of Effective Date.**

The Debtor shall give notice of the Effective Date.

**4.     Vesting of Assets and Operations of Property.**

**a)**     All property of the estate and the Property shall be transferred to the Reorganized Debtor on the Effective Date.

**b)**     On the Effective Date, pursuant to the Plan and the Confirmation Order, any receiver, custodian or similar person or entity appointed prior to the Effective Date for the Debtor or any of its property shall be terminated and discharged from its responsibilities and duties and all property, including Cash, of the Debtor held by such receiver, custodian or similar person or entity shall be immediately turned over to the Reorganized Debtor, without

setoff or offset.

**5.      Means to Implement the Plan.**

The Reorganized Debtor shall make all distributions required under the Plan (except the Class 1 Claim payments) out of the Exit Financing.

**6.      Objections to Claims/Administrative Claims/Interests.**

   **a)      Objections to Claims or Interests; Prosecution of Disputed Claims or Disputed Interests.**

LVH Pearville, as a joint-proponent of the Plan, or the Reorganized Debtor shall have the exclusive right to object to the allowance, amount or classification of Claims or Interests asserted in the Reorganization Case, and such objections may be litigated to Final Order by LVH Pearville, acting on behalf of the Reorganized Debtor.   Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Claims or Interests shall be filed no later than ninety days after the Effective Date, subject to any extensions granted pursuant to a further order of the Bankruptcy Court.   Such extensions may be obtained by LVH Pearville, upon *ex parte* motion.

   **b)      Estimation of Disputed Claims.**

The Debtor, and after the Effective Date, the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate for all purposes, including distribution under this Plan, any disputed, contingent or unliquidated Claim or Interest pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor or the Reorganized Debtor have previously objected to such Claim or Interest.   The Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest at any time, including, without limitation, during the pendency of an appeal relating to such objection.

c)  **No Distribution on Account of Disputed Claims.**

No Distribution shall be made with respect to all or any portion of any disputed, contingent, or unliquidated Claim or Interest until the entire Claim or Interest becomes an Allowed Claim or an Allowed Interest.

Pending resolution of a Disputed Claim, all Cash to be distributed to the holder of the Disputed Claim shall be placed in a segregated bank account at a federally insured financial institution and maintained by the Reorganized Debtor until distribution to the holder of such Claim under the Plan.  Distribution shall be made only from the Disputed Claims reserve and only at such time as a particular Claim is determined to be an Allowed Claim.  The holder of a Disputed Claim that is ultimately allowed shall have no recourse against the Reorganized Debtor or its property for the payment of its Allowed Claim.  No interest shall accrue or will be paid with respect to any Disputed Claim for the period from the Effective Date to the date a distribution, if any, is made with respect to said Disputed Claim upon becoming an Allowed Claim.  To the extent that a Disputed Claim ultimately is disallowed or allowed in an amount less than the amount of the reserves for such Disputed Claim, any resulting surplus in the reserve shall be transferred from the reserve and paid on a pro rata basis to the holders of allowed unsecured claims.

7.  **Claims Against Others**

The Debtor believes it has valid claims against various parties including but not limited to the claim asserted against Brewer for among other claims, negligence, professional negligence, negligent misrepresentation, breach of fiduciary duty, and breach of contract.  This action is currently pending in the 280th Judicial District, Harris County, Texas, and is listed as Case No. 2009-04632.  The Debtor does not know what its recovery, if any, will be in this matter.

## VIII. TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

The Reorganized Debtor by the Confirmation Order will assume the Executory Contracts as scheduled on **EXHIBIT D-4**.  Unless expressly listed on **EXHIBIT D-4** as an Executory Contract being assumed by the Reorganized Debtor, all other Executory Contracts are deemed rejected by the Reorganized Debtor.  Except as otherwise agreed to by the parties to the applicable assumed Executory Contract, the Reorganized Debtor shall cure any and all undisputed defaults under any Executory Contract assumed by the Reorganized Debtor pursuant to the Plan in accordance with section 365(d) of the Bankruptcy Code except that any payment due from the Reorganized Debtor to cure said undisputed default shall be paid on the earlier of March 31, 2011 or the MUD-381 Tranche One Reimbursement Payment Date or as otherwise may be agreed to by the parties.

All disputed defaults that are required to be cured shall be cured either within thirty (30) days of entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto, or as otherwise may be agreed to by the parties.  However, in no case shall a payment pursuant to a disputed default be paid before the earlier of March 31, 2011 or the MUD-381 Tranche One Reimbursement Payment Date.

## IX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and certain U.S. holders of Claims and Interests.

The following summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in

effect on the date hereof.   Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.   No assurance can be given that legislative or administrative changes or court decisions may not be forthcoming which would require significant modification of the statements expressed in this section.   Certain tax aspects of the Plan are uncertain due to the lack of applicable regulations and other tax precedent.   The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.   Thus, no assurance can be given as to the interpretation that the IRS will adopt.

TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND ANY INTERESTS ARE HEREBY NOTIFIED THAT (a) ANY DISCUSSION OF TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE TAX CODE, AND (b) THIS DISCUSSION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OF THE PLAN.

HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT THEIR TAX ADVISOR TO DETERMINE THE AMOUNT AND TIMING OF ANY INCOME OR LOSS SUFFERED AS A RESULT OF THE CANCELLATION OF THE CLAIMS HELD BY SUCH PERSON, WHETHER SUCH INCOME OR LOSS IS ORDINARY OR CAPITAL AND THE TAX EFFECT OF ANY RIGHT TO, AND RECEIPT OF DEFERRED PAYMENT.

THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.   THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN

AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, ALL HOLDERS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## X. LIQUIDATION ANALYSIS UNDER CHAPTER 7

Under the Bankruptcy Code, in order for a plan to be confirmed, each creditor must receive or retain under the Plan a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

The Debtor believes that recoveries under a Chapter 7 liquidation scenario would be significantly lower than those proposed by the Plan for a variety of reasons. First, the sale of the Debtor's primary asset under a compressed timeframe and the distressed nature of a Chapter 7 liquidation will most likely result in lower sale values than the Debtor will receive under the terms of the Plan due to the lack of liquidity in today's market. The Debtor's real estate assets have a combined estimated value of $7.6 million. IBC holds a first lien on these assets and the IBC Claim exceeds the combined value of these assets. Accordingly, any sales proceeds will be used to satisfy the IBC Claim. Second, the conversion of the case to Chapter 7 liquidation would necessitate the payment of fees to the Chapter 7 Trustee, and attorneys, accountants and other professionals retained by the Chapter 7 Trustee, for disposition of the assets. These fees directly reduce any recovery otherwise available to creditors and/or the holders of Partnership Interests.

Accordingly, each holder of a Claim will receive or retain under the Plan a recovery that has a value at least equal to the value of the distribution that such creditor would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

THE PLAN PROPONENTS BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED HEREIN BECAUSE IT SHOULD PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN A CHAPTER 7 LIQUIDATION TO THE HOLDERS OF SECURED AND UNSECURED CLAIMS WHO WOULD LIKELY RECEIVE LESS IN A CHAPTER 7 LIQUIDATION. IN ADDITION, OTHER ALTERNATIVES WOULD INVOLVE DELAY, UNCERTAINTY, AND SUBSTANTIAL ADMINISTRATIVE COSTS.

## XI. CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

## A.   VOTING AND OTHER PROCEDURES

A Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Claims that are entitled to vote to accept or reject the Plan. Each holder of a Claim in Classes 1, 2, 3, and 4 shall be entitled to vote to accept or reject the Plan. Each holder of an Interest in Class 5 is deemed to have rejected the Plan.

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes of claims that are impaired under the terms and provisions of a chapter 11 plan and are to receive distributions thereunder are entitled to vote to accept or reject the plan. Classes of claims in which the holders of claims and interests will not receive or retain any property under a chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. Classes of claims in which the holders of claims or interests are Unimpaired under a chapter 11 plan are deemed to have accepted the Plan and also are not entitled to vote to accept or reject the plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (i) claims, as acceptance by creditors actually voting in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims; and (ii) interests, as acceptance by interest holders in that class actually voting that hold at least two-thirds in number of the shares of the common stock of a debtor.

26

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or otherwise in accordance with the provisions of the Bankruptcy Code.

With respect to the Plan, any holder of a Claim in an Impaired Class (i) whose Claim has been listed by the Debtor in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated), or (ii) who filed a proof of claim on or before the applicable bar date (or, if not filed by such date, any proof of claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court), which Claim has not been disallowed and is not the subject of an objection, is entitled to vote. Holders of Claims that are disputed, contingent and/or unliquidated are entitled to vote their Claims only to the extent that such Claims are Allowed for the purpose of voting pursuant to an order of the Bankruptcy Court. The Debtor may seek a determination that any Class of Claims that is entitled to vote to accept or reject the Debtor's Plan that does not vote to accept or reject the Debtor's Plan be deemed to accept the Plan, as applicable.

After carefully reviewing this Disclosure Statement, including any exhibits, each holder of an Allowed Claim or Partnership Interest entitled to vote may vote whether to accept or reject the Debtor's Plan. A Ballot for voting on the Plan accompanies this Disclosure Statement. If you hold a Claim or Partnership Interest in more than one Class and you are entitled to vote Claims in more than one Class, you may receive a Ballot or Ballots, which will permit you to vote in all appropriate Classes of Claims. Please vote and return your Ballot to Spencer Crain Cubbage Healy & McNamara, pllc, as follows, whether by U.S. mail, or by hand delivery or courier service:

> **Spencer Crain Cubbage Healy & McNamara, pllc**
> **Attention: Ella Goettle**
> **1330 Post Oak Blvd., Suite 1600**
> **Houston, Texas 77056**

ANY EXECUTED BALLOT THAT FAILS TO INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED. BALLOTS RETURNED TO SPENCER CRAIN CUBBAGE HEALY & MCNAMARA, PLLC BY FACSIMILE TRANSMISSION OR ANY OTHER ELECTRONIC MEANS WILL NOT BE COUNTED.

> **THE VOTING DEADLINE IS**
> **5:00 P.M., CENTRAL**
> **TIME ZONE, ON**
> **December 8, 2010.**

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. ALL CREDITORS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

Ballots must be *received* by Spencer Crain Cubbage Healy & McNamara, pllc by the Voting Deadline. If a Ballot is received after the Voting Deadline, it will not be counted. Complete the Ballot by providing all the information requested, and sign, date and return the Ballot by mail, overnight courier or personal delivery to Spencer Crain Cubbage Healy & McNamara, pllc at the address set forth above.

28

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN THE TIME AND DATE SET FORTH IN THE ACCOMPANYING NOTICE.

If you are entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please telephone the Voting Agent at the following telephone number: **1-713-963-3670**.

**B.     DISCLAIMERS AND ENDORSEMENTS**

This Disclosure Statement contains information about the Debtor's Plan.  Holders of Claims and Partnership Interests are urged to study the text of the Plan carefully to determine the impact of the Plan on their Claims or Partnership Interests and to consult with their financial, tax and legal advisors.

Nothing contained in this Disclosure Statement or the Plan will be deemed an admission or statement against interest that can be used against the Debtor in any pending or future litigation. Any reference to creditors or Claims or Partnership Interests in this Disclosure Statement is not an admission with respect to the existence, ownership, validity, priority, or extent of any alleged Lien, Claim, Partnership Interest or encumbrance.

Certain statements and assertions in this Disclosure Statement may be subject to dispute by parties in interest.

**C.     THE CONFIRMATION HEARING**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing with respect to the Plan.  The Confirmation Hearing in respect of the Plan has been scheduled for December 13, 2010, and at 3:00 p.m. before the Honorable Karen K. Brown, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District

of Texas, at the United States Courthouse for the Southern District of Texas, Courtroom No. 403. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than an announcement of the adjourned date made at the Confirmation Hearing or posted at the courthouse at the Confirmation Hearing or at an adjournment thereof. Any objection to confirmation (i) must be made in writing, (ii) must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or a description of the interest in the Debtor held by the objector, and (iii) must be timely made. Any such objections must be filed with the Bankruptcy Court  on or before December 9, 2010 and served so that they are received by the Debtor's counsel and counsel for LVH Pearville LLC, on or before December 6, 2010:

> **Counsel for the Debtor:**
>
> **Spencer Crain Cubbage Healy & McNamara, pllc**
> **Thomas H. Grace**
> 1330 Post Oak Blvd., Suite 1600
> Houston, TX  77002
> (713) 963-3669  Telephone
> (713) 963-4663  Fax
>
> **Counsel for LVH Pearville:**
>
> **Adair & Myers PLLC**
> **Thomas W. Graves**
> 3120 Southwest Freeway, Suite 320
> Houston, Texas 77098
> (713)522-2270  Telephone
> (713)522-3322  Fax

**D.    CONFIRMATION**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are that the plan is (i) accepted by all Impaired Classes of Claims or, if

rejected by an Impaired Class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible, and (iii) in the "best interests" of creditors that are Impaired under the Plan.

## E.    UNFAIR DISCRIMINATION AND FAIR AND EQUITABLE TESTS

Under the Bankruptcy Code, a plan does not have to be accepted by every class of creditors or interest holders to be confirmed.  If a class of claims rejects a plan or is deemed to reject a plan, the plan proponent has the right to request confirmation of the plan pursuant to Section 1129(b) of the Bankruptcy Code the so-called "cramdown" provision of the Bankruptcy Code.  Section 1129(b) permits the confirmation of a plan notwithstanding the non-acceptance of such plan by one or more impaired classes of claims and interests.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class, and meets the other legal criteria for confirmation.

In the event that any Class of Claims or Partnership Interests fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtor reserves the right to (a) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, and/or (b) modify the Plan in accordance with section 1127(a) of the Bankruptcy Code.

Accordingly, to obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." The Bankruptcy Code establishes "cram down" tests for Classes of Secured Claims, unsecured Claims and Interests that do not accept the plan, as follows:

### i.  Secured Creditors

Either (a) each Impaired Secured creditor retains the Liens securing its Secured Claim and receives on account of its Secured Claim deferred cash payments (x) totaling at least the Allowed Amount of the Secured Claim and (y) having a present value at least equal to the value of the Secured creditor's collateral, (b) each Impaired Secured creditor realizes the "indubitable equivalent" of its Allowed Secured Claim, or (c) the property securing the Claim is sold free and clear of Liens with the Secured creditor's Lien to attach to the proceeds of the sale and such Lien on proceeds is treated in accordance with clause (a) or (b) of this subparagraph.

### ii.  Unsecured Creditors

Either (a) each Impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its Allowed Claim, or (b) the holders of Claims and Interests that are junior to the Claims of the dissenting Class will not receive any property under the plan, and the "best interest" test is met so that each Impaired unsecured creditor recovers at least what that creditor would receive if the case was converted to a chapter 7 case.

### iii.  Holders of Interests

Either (a) each holder of Impaired Interests receives or retains under the plan property of a value equal to the greatest of the Allowed Amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (b) no holder of junior interests receives or retains any property, and the "best interest" test is met, so that each Impaired Interest holder recovers at least what that Partnership Interest holder would receive if the case was converted to a chapter 7 case.

### iv.  No Unfair Discrimination

In addition, the "cram down" standards of the Bankruptcy Code prohibit "unfair discrimination" with respect to the claims of any impaired, non-accepting class. While the

"unfair discrimination" determination depends upon the particular facts of a case and the nature of the claims at issue, in general, courts have interpreted the standard to mean that the impaired, non-accepting class must receive treatment under a plan of reorganization which allocates value to such class in a manner that is consistent with the treatment given to other classes with claims against the debtor of equal or junior status.

All Classes of Claims will receive distributions under the Plan; thus, no Classes of Claims are conclusively presumed to have rejected the Plan.  The Debtor believes that the treatment of all Classes of Claims and Interests under the Plan satisfies the "no unfair discrimination" requirement for nonconsensual confirmation of the Plan under section 1129(b) of the Bankruptcy Code.  With respect to each such Impaired, non-accepting Class, there is no Class of equal priority receiving more favorable treatment under the Plan, and no Class that is junior to such Impaired, non-accepting Class will receive or retain any property under the Plan on account of the Claims or Interests in such Class.

**F.     FEASIBILITY**

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless the liquidation of the debtor is provided for in the plan.  Assuming the conditions precedent to the occurrence of the Effective Date are met, including, the funding of the Exit Financing contemplated by the Plan, it is not likely that the Confirmation will be followed by liquidation or the need for further financial reorganization of the Debtor.

**G.     BEST INTEREST TEST**

In order to confirm a plan of reorganization, the Bankruptcy Court must determine that the Plan is in the best interests of all classes of creditors and equity security holders impaired under that Plan. The "best interest" test requires that the Bankruptcy Court find that the plan

provides to each member of each impaired class of claims and interests (unless each such member has accepted the plan) a recovery which has a value at least equal to the value of the distribution that each creditor or interest holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

All Classes of Claims will receive distributions under the Plan; thus, no Classes of Claims are conclusively presumed to have rejected the Plan.  The Debtor requests confirmation of the Plan over the rejection of any Classes.  In so doing, the Debtor seeks to establish that the Plan complies with the best interest of creditors test with respect to any such Class or Classes, and satisfy all other legal criteria for confirmation.

As reflected in the discussion above, and as demonstrated in the Liquidation Analysis contained in this Disclosure Statement, the Debtor believes that the Plan provides to each holder of a Claim and Interest holder a value at least equal to the value of the distribution that each holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

## H.    CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST AND PARTNERSHIP INTERESTS IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN (AND ANY DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.   THESE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND THE IMPLEMENTATION OF THE PLAN.

## I.    CERTAIN BANKRUPTCY CONSIDERATIONS

### 1.    Risk of Liquidation of the Debtor's Estate

If the Plan is not confirmed and consummated, there can be no assurance that the Debtor's Chapter 11 Case will continue as chapter 11 reorganization case rather than be converted to liquidation, or that any alternative plan of reorganization would be on terms as favorable or more favorable to holders of Claims and Partnership Interests as the terms of the Plan.  If a liquidation or different reorganization were to occur, the distributions to certain holders of Allowed Claims may be reduced, or possibly completely eliminated.  As previously noted, the Debtor believes that in a liquidation under chapter 7, additional administrative expenses of a chapter 7 trustee and such trustee's attorneys, accountants, and other professionals, would cause a diminution in the value of the Debtor's Estate.  In addition, certain additional Claims may arise in a chapter 7 liquidation and from the rejection of unexpired leases and other executory contracts in connection with any cessation of the Debtor's operations.  As described above, this might negatively impact the amount of distributions under the Plan, if any, to holders of Allowed Claims or Allowed Partnership Interests.  As a result of these circumstances, the Debtor believes that the Plan provides a significantly higher return to holders of Claims against and Partnership Interests in the Debtor, as compared to liquidation.

### 2.    Risk of Non-Occurrence of the Effective Date

The occurrence of the Effective Date in the Plan is conditioned upon the happening of certain events.  There can be no assurance that all of these events will occur or that those that do not occur will be waived.  Accordingly, even if the Plan is confirmed, there can be no assurance that the Effective Date will occur.

### 3.    Uncertainty Regarding Objections to Claims

The Plan provides that certain objections to Claims can be filed with the Bankruptcy Court after the Effective Date. A creditor may not know that its Claim will be objected to until after the Effective Date.

## XII. THIRD PARTY CLAIMS

Under the Bankruptcy Code, the Debtor possesses claims against third parties that arise either under the Bankruptcy Code or existing law. In connection with this case, the Debtor discloses the following:

(a)     The Debtor believes it has valid claims against various parties including but not limited to the claim asserted against Brewer & Escalante Associates, Inc. for among other claims, negligence, professional negligence, negligent misrepresentation, breach of fiduciary duty, and breach of contract. This action is currently pending in the 280th Judicial District, Harris County, Texas, and is listed as Case No. 2009-04632.

(b)     The Debtor possesses claims against insiders for payments made within one year of filing as set forth on **EXHIBIT D-5**. The payments to the insiders are either: (i) pass through payments of non-Debtor funds; or (ii) payment of property management fees. The Plan Proponents have determined that they will not pursue action on those potential claims because, among other reasons: (a) the cost of litigation will be greater than the anticipated recovery; (b) the recipients of the insider payments at issue possess defenses of to avoidable transfer claims; and (c) issues exist as to the collectability of these payments.

## XIII. CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to any alternative. In addition, any other alternative would involve significant delay, litigation, uncertainty, substantial additional administrative costs, and may result in the Debtor's

liquidation. The Debtor urges holders of Impaired Claims and Partnership Interests against the Debtor to vote in favor of the Plan.

Dated:  November 23, 2010

DISCLOSURE STATEMENT FILED BY:

By:    /s/ Thomas H. Grace
      **Thomas H. Grace**
      Texas Bar No. 00785453
      Federal Bar No. 12618
      SPENCER CRAIN CUBBAGE HEALY &
      MCNAMARA, PLLC
      1330 Post Oak Blvd., Suite 1600
      Houston, TX  77002
      (713) 963-3669  Telephone
      (713) 963-4663  Fax

      and

      **Meagan Martin**
      Texas Bar No. 24050997
      Federal Bar No. 1045350
      1201 Elm Street, Suite 4100
      Dallas, Texas 75270
      (214)290-0029   Telephone
      (214)290-0099  Fax

      **BANKRUPTCY COUNSEL FOR
      PEARVILLE, L.P.**

      /s/ Thomas W. Graves
      **Thomas W. Graves**
      Texas Bar No. 08312500
      Marc D. Myers
      ADAIR & MYERS P.L.L.C.
      3120 Southwest Freeway, Suite 320
      Houston, Texas 77098
      (713)522-2270   Telephone
      (713)522-3322  Fax

      **COUNSEL FOR LVH PEARVILLE
      LLC**

# EXHIBIT D-1: CHAPTER 11 PLAN OF REORGANIZATION

(NEXT PAGE)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No.  10-34074** |
| **PEARVILLE, L.P.** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |

## THE DEBTOR AND LVH PEARVILLE LLC'S
## AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## DATED: NOVEMBER 23, 2010

Pearville, L.P., referred to as the "Debtor", the debtor and debtor in possession in this bankruptcy case under chapter 11 of the Bankruptcy Code, and LVH Pearville LLC (together, the "Plan Proponents") jointly propose this Plan of Reorganization ("Plan") for the resolution of all outstanding creditor Claims and Partnership Interests.  Reference is made to the Disclosure Statement filed by the Debtor and LVH Pearville LLC (the "Disclosure Statement") for a discussion of the Debtor's history and results of operations.  All creditors and interest holders are encouraged to review the Disclosure Statement prior to voting on the Plan.

## ARTICLE I.

## DEFINITIONS AND RULES OF CONSTRUCTION

A.      **Definitions.**

In addition to such other terms as are defined in other Sections of this Plan, the following terms (which appear in the Plan as capitalized terms) have the following meanings as used in the Plan.

1.      **"Administrative Claim"** means a claim for costs and expenses of administration

of the Reorganization Case under section 503(b) of the Bankruptcy Code entitled to priority pursuant to section 507(a)(1) of the Bankruptcy Code.

2.     **"Allowed Administrative Claim"** means all or that portion of an Administrative Claim which has been allowed pursuant to a Final Order of the Bankruptcy Court.

3.     **"Allowed Claim"** or **"Allowed Interest"** means, respectively, except as otherwise allowed or provided for in the Plan or a Final Order of the Bankruptcy Court, a Claim or a Partnership Interest, proof of which was timely and properly Filed or, if no proof of claim or proof of interest was Filed, which has been or hereafter is listed by the Debtor on its Schedules as liquidated in amount and not disputed or contingent, and, in either case, as to which:

> (a) no objection to the allowance thereof has been interposed on or before the later of: (i) the ninety (90) day after the Effective Date, or (ii) such other applicable period for objection as may be fixed or extended by the Court, or

> (b) any objection thereto has been determined by a Final Order to the extent such objection is determined in favor of the respective holder.

Unless otherwise specified herein or by order of the Court, an "Allowed Claim" shall not include any interest, fees, costs or other charges on such Claim accruing after the Petition Date.

4.     **"Allowed Priority Tax Claim"** means all or that portion of a Priority Tax Claim which has been allowed pursuant to a Final Order of the Bankruptcy Court.

5.     **"Avoidance Actions"** means all of the Debtor's and the Estate's rights and claims under sections 541 through 553 of the Bankruptcy Code, inclusive, or under any similar or related state or federal statute or common law, whether or not an action is initiated on or before the Effective Date.

6.     **"Ballot"** means the form to be distributed with the Disclosure Statement to each

2

holder of an Impaired Claim or Partnership Interest on which the holder is to indicate acceptance or rejection of the Plan.

7.      **"Balloting Deadline"** means the date and time, as set by an Order of the Bankruptcy Court and set forth in the Disclosure Statement, by which all Ballots must be received at the address set forth used for voting on the Plan, as such date may be extended by an order.

8.      **"Bankruptcy Code"** means Title 11 of the United States Code, or the Bankruptcy Reform Act of 1978, as amended.

9.      **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of Texas (Houston Division), or, in the event such court ceases to exercise jurisdiction over the Reorganization Case, such court or adjunct thereof that exercises jurisdiction over the Reorganization Case in lieu of the United States Bankruptcy Court for the Southern District of Texas.

10.     **"Bankruptcy Rules"** means collectively, the (a) Federal Rules of Bankruptcy Procedure, (b) Federal Rules of Civil Procedure and, (c) Local Rules of the Bankruptcy Court, as applicable from time to time in the Reorganization Case or proceedings therein, as the case may be.

11.     **"Business Day"** means any day other than a Saturday, Sunday or Federal holiday in the United States.

12.     **"Cash"** means cash or cash equivalents.

13.     **"Causes of Action"** means, without limitation, any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, debts, sums of money, damages, judgments, claims and demands, actions, defenses, offsets, powers (including all police,

3

regulatory, and enforcement powers and actions that may be taken), privileges, licenses, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whatsoever, whether known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or tort, in law, equity or otherwise, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured and whether asserted or assertable. For avoidance of doubt, Causes of Action include, but are in no way limited to (a) damages, (b) the recovery of monies, (c) lien avoidance, subordination, surcharge, recharacterization, rights of setoff, counterclaim or recoupment, and claims on contracts or for breaches of duties imposed by law, (d) tax refunds, (e) injunctive, equitable, or other relief, (f) claims pursuant to Section 362 of the Bankruptcy Code, (g) such claims and defenses as fraud, mistake, duress, and usury, (h) Avoidance Claims, and (i) all causes of action that may be directly or derivatively asserted on behalf of the Debtor, its Estate, or the Reorganized Debtor.

14. **"Claim"** shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

15. **"Class"** means a category of holders of Claims or Partnership Interests classified together pursuant to section 1123(a)(11) of the Bankruptcy Code.

16. **"Class 1 Claim Note"** shall mean the note created by operation of the Plan in satisfaction of the Class 1 Claim.

17. **"Class 4 Claim Note"** shall mean the note created by operation of the Plan in satisfaction of the Class 4 Claim.

18. **"Class 3 Claim Consideration"** shall mean $50,000 contributed to the Debtor by LVH Pearville as part of the Exit Financing.

4

19. **"Confirmation Date"** means the date on which the Confirmation Order is entered on the docket of the Bankruptcy Court.

20. **"Confirmation Hearing"** means the hearing held pursuant to section 1128(a) of the Bankruptcy Code at which the Bankruptcy Court considers confirmation of the Plan, including any continuances thereof.

21. **"Confirmation Order"** means the order of the Bankruptcy Court entered following the Confirmation Hearing that confirms the Plan.

22. **"Consolidated Van Hessen Claim"** shall mean the Van Hessen Claim and two claims in which Van Hessen has taken an assignment: (i) the IBC Deficiency Claim and (ii) the T&S Claim.

23. **"Debtor"** means Pearville, L.P.

24. **"Debtor in Possession"** means the Debtor between the Petition Date and the Effective Date.

25. **"Debtor's Cash"** means (1) the Cash held by the Debtor on the Effective Date; and  (2) any Cash or any cash collateral owned by or in which the Debtor has an interest under Section 541 of the Bankruptcy Code.

26. **"Disallowed Claim"** means (a) a Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, (b) a Claim or any portion thereof that is Scheduled at zero or as contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) a Claim or any portion thereof that is not Scheduled and as to which a proof of claim bar date has been established but

no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

27. **"Disallowed Interest"** means a Partnership Interest or any portion thereof that has been disallowed by a Final Order or a settlement.

28. **"Disclosure Statement"** means the Joint Disclosure Statement of the Debtor and LVH Pearville LLC, as modified or amended, filed with and approved by the Bankruptcy Court on [_____, 2010].

29. **"Disputed Claim"** or **"Disputed Interest",** mean any Claim or Partnership Interest, that is neither an Allowed Claim nor a Disallowed Claim, or an Allowed Interest nor a Disallowed Interest, as the case may be.  In the event that any part of a Claim or Interest is disputed, such Claim or Interest in its entirety shall be deemed to constitute a Disputed Claim or Disputed Interest for purposes of distribution under the Plan unless a Final Order has been entered providing otherwise. Without limiting any of the foregoing, a Claim or Interest that is the subject of a pending objection, motion, complaint, counterclaim, setoff, Avoidance Claims, litigation claim or other defense, or any other proceeding seeking to disallow, subordinate or estimate such Claim, shall be deemed to constitute a Disputed Claim or Disputed Interest, as the case may be.

30. **"Effective Date"** shall be fourteen (14) days after the Confirmation Order becomes a Final Order.

31. **"Estate"** means the estate created in the Reorganization Case under section 541 of the Bankruptcy Code.

32. **"Executory Contracts"** means the executory contracts and leases assumed by the

Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and more further described in **EXHIBIT B** of this Plan.

33.     **"Exit Financing"** means the funds to be contributed to the Debtor by LVH Pearville on or before the Effective Date.

34.     **"File"** or **"Filed"** means filed with the Bankruptcy Court in the Reorganization Case, as reflected on the official docket of the Bankruptcy Court for the Reorganization Case.

35.     **"Final Order"** means an order or judgment of the Bankruptcy Court or other applicable court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtor or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other applicable court shall have been affirmed by the highest court to which such order or judgment was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired, with no further appeal, petition for certiorari or motion for reargument or rehearing pending; *provided, however,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule of the Bankruptcy Rules, may be filed with respect to such order or judgment shall not render such order or judgment not to be a Final Order.

36.     **"Impaired"** means a Claim or Interest or a Class of Claims or a Class of Interests that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

37.     **"Interest"** means the holder of any current or former holder of an "equity

7

security" (as defined in Section 101(16) of the Bankruptcy Code), and includes all Partnership Interests.

38.     **"International Bank of Commerce"** or **"IBC"** means the International Bank of Commerce and any affiliates, successors or assigns thereof.

39.     **"IBC $8.4 Million Note"** means a certain Real Estate Lien Note executed by the Debtor payable to the order of IBC dated September 6, 2006 in the original amount of $8,400,000.00 as the same may have been amended, renewed, or rearranged from time to time.

40.     **"IBC $7.6 Million Note"** means a certain Real Estate Lien Note executed by the Debtor payable to the order of IBC dated August 17, 2004 in the original amount of $7,600,000.00 as the same may have been amended, renewed, or rearranged from time to time.

41.     **"IBC Claim"** means all claims of IBC evidenced by, arising under or relating to the IBC Loan Documents, including but not limited to claims arising from the IBC $8.4 Million Note and the IBC $7.6 Million Note.

42.     **"IBC Collateral"** means any of the Debtor's assets, including the Debtor's Cash and Property, in which IBC has a senior valid, perfected security interest.  As part of the IBC Settlement, the parties acknowledged and confirmed that the PAD Sites are not included in the IBC Collateral securing the IBC $8.4 Million Note.

43.     **"IBC Loan Documents"** means all documents evidencing the IBC $8.4 Million Note and the IBC $7.6 Million Note.

44.     **"IBC Deficiency Claim"** means the portion of the IBC Claim (if any) that exceeds the principal value of the Class 1 Claim Note.

45.     **"IBC Settlement"** means the settlement and note purchase agreement made by and among the Debtor, IBC, Van Hessen and LVH Pearville dated November 9, 2010.  A true

8

and correct copy of the terms of the IBC Settlement are located at **EXHIBIT A** of this Plan.

46.   **"IBC Settlement Payments"** are the payments by Van Hessen to IBC under the terms of the IBC Settlement, including the "Settlement Payment" and "Note Purchase Consideration" as those terms are defined in the Term Sheet.

47.   **"LVH Pearville"** means LVH Pearville, LLC, a Plan Proponent and the party providing the Exit Financing funds that will be used to pay the Class 2, 3, and 4 obligations pursuant to the terms of the Plan.

48.   **"Materialmens Lien Holders"** means any creditor of the Debtor's Estate that (i) furnished construction services and/or materials for the construction of the Debtor's Property; and (ii) has asserted a materialmens or mechanics lien on the Debtor's Property.  Materialmens Lien Holders include both senior contractors and their subcontractors.

49.   **"MUD-381"** means the Harris County Municipal Utilities District No. 381.

50.   **"MUD-381 Tranche One Reimbursement"** means the first reimbursement payment that the Reorganized Debtor expects to receive from the MUD-381.

51.   **"MUD-381 Tranche One Reimbursement Payment Date"** means date on which the Reorganized Debtor receives the MUD-381 Tranche One Reimbursement.

52.   **"New York Prime Rate"** means the annual lending rate of interest announced from time to time by JP Morgan Chase & Co, New York, New York, as its prime rate.

53.   **"Partners"** mean collectively the Partners of the Debtor.

54.   **"Partnership Interests"** means the respective legal, equitable, contractual and other rights and ownership interests of the Partners in and with respect to the Debtor.

55.   **"Peltier"** means Peltier Brothers Construction LP, a creditor of the Debtor.

56.   **"Petition Date"** means May 14, 2010.

57.    **"Plan"** means this plan of reorganization, either in its present form or as it may be altered, amended, or modified from time to time by the Debtor or the Reorganized Debtor in accordance with the Bankruptcy Code and Bankruptcy Rules.

58.    **"Priority Tax Claim"** shall mean any Claim that is due on an accrual basis through the petition date entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, but only to the extent it is entitled to priority under such subsection.

59.    **"Property"** means the land, buildings, improvements and equipment located at 10555 Pearland Parkway, Houston, Texas 77089 and the Debtor's Cash.

60.    **"Reorganization Case"** means this bankruptcy case under chapter 11 of the Bankruptcy Code.

61.    **"Reorganized Debtor"** means the Debtor, as revested with property of the Estate to the extent provided in this Plan, on or after the Effective Date.

62.    **"Retained Causes of Action"** means any and all claims, Causes of Action, demands, defenses, suits, judgments, choses in action, licenses, privileges, agreements, and all other rights and remedies (legal or equitable) of the Debtor and the Estate, for or on behalf of Creditors and/or the Debtor and/or the Estate, including but not limited to any and all claims and/or Causes of Action by the Estate and/or the Debtor, against any and all Creditors, Governmental Units, or other Persons, of every kind or nature, whether known or unknown, suspected or unsuspected, liquidated or unliquidated, matured or unmatured, whether arising before, on or after the Petition Date, in contract or in tort, at law or in equity, and whether or not brought as of the Effective Date, including but not limited to those for (i) damages, (ii) the recovery of monies, (iii) lien avoidance, subordination, surcharge, recharacterization, setoff, counterclaim, contribution or recoupment, (iv) tax refunds, (v) claims and defenses such as

10

fraud, mistake, duress and usury, (vi) claims on contracts or for breaches of duties imposed by law, (vii) injunctive, equitable or other relief, (viii) claims and Causes of Action that may be asserted derivatively on behalf of the Debtor, the Estate, or the Reorganized Debtor, (ix) claims and Causes of Action pursuant to section 362 of the Bankruptcy Code, and (x) all Avoidance Actions.

63. **"Scheduled"** means the claims set forth, stated or listed on the Schedules.

64. **"Schedules"** means the Schedules of Assets and Liabilities and List of Equity Security Holders Filed by the Debtor under the Bankruptcy Rules, as the same have been or may be amended from time to time before the Effective Date.

65. **"Secured Claim"** shall mean a claim by a creditor possessing a valid and perfected security interest as such term is defined in the Bankruptcy Code.

66. **"Tenant Leases"** means leases between the Debtor and its tenants which are subject to assumption pursuant to 11 USC §365.

67. **"Term Sheet"** means the settlement and note purchase agreement terms made by and among the Debtor, IBC, Van Hessen and LVH Pearville dated November 9, 2010. A true and correct copy of the Term Sheet is located at **EXHIBIT A** of this Plan. With regard to the IBC Settlement, if there is any inconsistency between the Term Sheet and the Plan, the Term Sheet controls.

68. **"Troy Construction"** means Troy Construction LLC, a creditor of the Debtor.

69. **"T&S"** means Tribble & Stephens Constructors, Ltd., a creditor of the Debtor.

70. **"T&S Claim"** means the Claim of T&S.

71. **"T&S Litigation"** means the certain lawsuit captioned *Tribble & Stephens Constructors, Ltd. v. International Bank of Commerce & Pearville, LP*, originally filed in the

11

80th Judicial District of Texas, Cause No. 2009-51129, and removed to the Bankruptcy Court as Adversary Proceeding No. 10-03275.

72.     **"Unsecured Claim"** means any claim that is not an Administrative Claim, Priority Claim, Secured Claim, or a Claim otherwise specifically classified in another class in this Plan.

73.     **"Van Hessen"** means Paul J.A. "Lex" Van Hessen and any affiliates, successors, or assigns thereof.

74.     **"Van Hessen Claim"** means all claims of Van Hessen evidenced by, arising under, or relating to the Van Hessen Loan Documents.

75.     **"Van Hessen Loan Documents"** means all documents evidencing Van Hessen's loans to the Debtor.

**B.     Rules of Interpretation.**

Any term used in this Plan that is not defined in this Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**C.     Rules of Construction.**

For purposes of this Plan:

1.     Whenever from the context it is appropriate, each term whether stated in the singular or the plural shall include both the singular and the plural;

2.     Unless otherwise specified in a particular reference, all references in the Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to the Plan;

3.     The words "herein," "hereof," "hereto," "hereunder," and others of similar import

12

refer to the Plan in its entirety rather than only a particular portion of the Plan;

4.      Captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

5.      All Exhibits to this Plan are incorporated herein;

6.      The rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and

7.      As to the timing of any required under this Plan, the phrase "on the Effective Date" shall mean "on the Effective Date, or as soon as reasonably practicable thereafter", and the phrase "on or before the Effective Date" shall mean "on or before the Effective Date, or as soon as reasonably practicable thereafter."

**D.      Time Periods.**

In computing any time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II.**

**DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS**

In addition to the unclassified Allowed Administrative Expense Claims and the Allowed Priority Tax Claims, the Plan has four Classes of Claims and one Class of Interests designated as follows:

- *Class 1: Secured Portion of IBC $8.4 Million Note*.  This Class consists of the Allowed Secured Claim of the holder of the IBC $8.4 Million Note.

- *Class 2: IBC $7.6 Million Note*.  This Class consists of the Allowed Claim of IBC based upon the IBC $7.6 Million Note.  It is anticipated that this note shall be cancelled and

13

discharged prior to the Confirmation Date such that there will be no Class 2 Claim on the Effective Date.

- *Class 3: General Unsecured*. This Class consists of Allowed Unsecured Claims which are not entitled to priority under section 507(a) of the Bankruptcy Code.

- *Class 4: Consolidated Van Hessen Claim*. This Class consists of the Van Hessen Claim, and the two claims in which Van Hessen has taken an assignment: (i) the IBC Deficiency Claim and (ii) the T&S Claim.

- *Class 5: Partnership Interests*. The Class consists of the partnership interests of the Debtor.

## ARTICLE III. TREATMENT OF CLAIMS AND INTERESTS

The Plan contemplates that LVH Pearville shall provide the Exit Financing to the Debtor on the Effective Date in an amount sufficient to (i) provide additional operating capital for the Reorganized Debtor; (ii) fund the cure payments for executory contracts and leases to be assumed by the Reorganized Debtor; and (iii) fund the payments to the following Allowed Claims: Administrative Expense Claims, Priority Tax Claims, and Class 3 Claims. The proposed payments for the Class 1 and 3 Claims shall be paid by the Reorganized Debtor pursuant to the terms described herein. In exchange for providing the Exit Financing, LVH Pearville, LLC, shall receive (i) 100% of the equity interest in the Reorganized Debtor; and (ii) a lien on all of the Reorganized Debtor's assets to secure the amount of the Exit Financing as well as any future cash infusions necessary to fund cash flow deficiencies until the project is able to generate a positive cash flow. On the Effective Date, the Debtor, now a limited partnership, shall be converted to a limited liability company.

**A.      Class 1 – Secured Portion of IBC $8.4 Million Note**

14

The holder of the Class 1 Claim is entitled to vote. The Class 1 Claim shall be satisfied in the following manner:

    i. *Capitalization*. On the Effective Date, the Class 1 Claim shall be capitalized as the Class 1 Claim Note with a principal amount of $7,776,000.00.

    ii. *Interest Rate*. The Class 1 Claim Note shall bear interest at the New York Prime Rate plus 1.50% with a floor of 5.75% per annum.

    iii. *Term and Amortization*. Payments of interest only shall be made in equal payments commencing on January 31, 2011 for a period of 12 months. The Class 1 Claim Note shall be paid in full on January 31, 2012.

    iv. *Collateral*. The holder of the Class 1 Claim Note shall retain all of the lien and security interests in the IBC Collateral, with the same priority that existed on the Petition Date.

**B.**    **Class 2 – IBC $7.6 Million Note**

The holder of the Class 2 Claim is entitled to vote. The Class 2 Claim shall be satisfied in the following manner:

Upon receipt of the Settlement Payment (as that term is defined in the Term Sheet attached hereto at **EXHIBIT A**) and a full and final release of the T&S Litigation, IBC shall (i) cancel any and all indebtedness and otherwise discharge the IBC $7.6 Million Note; and (ii) release any and all liens encumbering the PAD Sites. Accordingly, there will be no payment by the Debtor under this Plan to the holder of the Class 2 Claim.

**C.**    **Class 3 –General Unsecured Claims**

The holders of Class 3 Claims are entitled to vote. The Class 3 Claims shall be satisfied in the following matter:

15

Each holder of an Allowed Class 3 Claim shall be paid its pro rata share of the Class 3 Consideration ($50,000.00) on the later of: (a) ninety (90) days after the Effective Date; or (b) the date such Class 3 Claim becomes an Allowed Claim.  Any default interest, late fees, legal fees, or other contractual penalties shall be deemed waived as of the Effective Date.  Holders of Class 3 Claims will not receive interest on the unpaid balance of their Class 3 Claims.  The Exit Financing shall be the source of the Cash used to pay the Class 3 Claim.

**D.     Class 4 – Consolidated Van Hessen Claim**

The holder of the Class 4 Claim is entitled to vote.  The Class 4 Claim shall be satisfied in the following manner:

      i. *Capitalization*.  On the Effective Date, the Class 4 Claim shall consolidated and capitalized as the Class 4 Claim Note with a principal amount of $3,848,125.94.

      ii. *Interest Rate*.  The Class 4 Claim Note shall bear interest at the New York Prime Rate plus 1.50% with a floor of 5.75% per annum.

      iii. *Term and Amortization*.  Payments of interest only shall be made in equal payments commencing on January 31, 2011 for a period of 12 months. Thereafter, the Class 4 Claim Note shall be amortized over a sixty month (five year) period.

      iv. *Collateral*.  The Class 4 Claim Note is not secured by any collateral in the Debtor or Reorganized Debtor's assets.

**E.     Class 5 - Partnership Interests**

Class 5 is impaired and is deemed to reject the Plan.  The holders of Partnership Interests in the Debtor shall surrender their Partnership Interests.

16

# ARTICLE IV.

## TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

### A.    Administrative Claims.

#### 1.    Generally.

Subject to the bar date provisions herein, the Reorganized Debtor shall pay each holder of an Allowed Administrative Claim against the Debtor on account of and in full satisfaction of such Allowed Administrative Claim, Cash equal to the amount of the Allowed Administrative Claim, on the later of: (a) the Effective Date, or (b) the date such Administrative Claim becomes an Allowed Administrative Claim, or, in either case, as soon thereafter as is practicable.

#### 2.    Payment of Statutory Fees.

On or before the Effective Date, the Debtor or Reorganized Debtor shall pay all fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, in Cash in full.

#### 3.    Bar Date For Administrative Claims.

##### i.    General Provisions.

Except as provided below for professionals and non-tax liabilities incurred in the ordinary course of business by the Debtor in Possession, requests for payment of Administrative Claims must be filed no later than thirty (30) days after the Effective Date.  Holders of Administrative Claims (including, without limitation, any governmental units asserting claims for federal, state, or local taxes) that are required to File a request for payment of such Claims and that do not File such requests by such bar date shall be forever barred from asserting such claims against the Debtor, Reorganized Debtor, any other person or entity, or any of their respective property.

17

Holders of Allowed Administrative Claims shall not be entitled to interest on their Administrative Claims.

### ii. Professionals.

All professionals or other entities requesting compensation or reimbursement of expenses under sections 327, 328, 330, 331, 503(b), 506 and 1103 of the Bankruptcy Code for services rendered before the Effective Date (including any compensation requested by any professional for any other entity for making a substantial contribution in the Reorganization Case or under any Bankruptcy Code section) shall File and serve on the Reorganized Debtor an application for final allowance of compensation and reimbursement of expenses no later than thirty (30) days after the Effective Date.

### iii. Ordinary Course Liabilities.

Holders of Administrative Claims based on liabilities incurred in the ordinary course of business of the Debtor in Possession prior to the Effective Date (other than professionals or other entities described in subparagraph (ii) above, and governmental units that hold claims for taxes or claims and/or penalties related to such taxes) shall not be required to File any request for payment of such claims. Such Administrative Claims shall be assumed and paid by the Reorganized Debtor in the ordinary course of business under the terms and conditions of the particular transaction giving rise to such Administrative Claim, without any further action by the holders of such claims.

### B. Priority Tax Claims.

To the extent such claims exist, each holder of an Allowed Priority Tax Claim shall receive one of the following two treatments, as determined by the Reorganized Debtor in its sole and absolute discretion, on account of and in full satisfaction of such Allowed Priority Tax

Claim: (a) Cash on the Effective Date, or on such other date on which such Priority Tax Claim becomes an Allowed Claim, in an amount equal to the amount of the Allowed Priority Tax Claim or (b) payment in sixty equal monthly payments with interest calculated in accordance with 11 U.S.C. section 511.

## ARTICLE V.

## MISCELLANEOUS PROVISIONS

### A.     Request for Relief under Bankruptcy Rule 9019.

By this Plan, the Plan Proponents are also requesting relief from the Bankruptcy Court pursuant to Bankruptcy Rule 9019 to approve certain compromises resolving the T&S Litigation and the IBC Litigation.

As more fully described in section V (E) of the Disclosure Statement, the Debtor was named as a defendant in the IBC Litigation and the T&S Litigation. Through the IBC Settlement (as memorialized in the Term Sheet at **EXHIBIT A**) and Van Hessen's purchase of the T&S Claim, the parties have essentially resolved both the IBC Litigation and the T&S Litigation. Pursuant to the terms of the IBC Settlement, IBC will cancel and otherwise discharge the IBC $7.6 Million Note and dismiss with prejudice the IBC Litigation in exchange for receiving (i) an $850,000 payment from Van Hessen; and (ii) obtaining a full and final release for IBC in the T&S Litigation. Thereafter IBC also agrees to release any liens it has on the PAD Sites which are the subject of the IBC Litigation. The IBC Settlement also provides that IBC, Van Hessen, LVH Pearville and the Debtor will enter into mutual releases in a form to be agreed upon providing a release of all claims by and between the parties and that each party shall bear its own fees and expenses including but not limited to those fees covered by the Porter & Hedges Proof of Claim. Further as part of Van Hessen's purchase of the T&S Claim, Van Hessen has taken an

19

assignment of that claim and stepped into the position of T&S as plaintiff in the T&S Litigation. Accordingly, the Plan Proponents seek the Bankruptcy Court's approval of the Plan Proponents' resolution of the IBC Litigation and T&S Litigation and the mutual releases granted there under as described in the Term Sheet.

Pursuant to Bankruptcy Rule 9019(a), the Court has the discretionary authority to approve a compromise of a controversy. *See Continental Airlines, Inc. v. Air Lines Pilots' Ass'n Int'l (In re Continental Airlines, Inc.)*, 907 F.2d 1500, 1508 (5th Cir. 1990). In both the T&S Litigation and IBC Litigation, the Debtor was a defendant and did not assert any affirmative claims. The proposed resolution of these two lawsuits as embodied in the IBC Settlement and Van Hessen's purchase of the T&S Claim is in the best interest of the Debtor and its creditors because the Debtor will not be responsible for making the payments called for under the settlement agreements and the Debtor had no affirmative claims for relief. Moreover, resolving the lawsuits was essential to for a successful reorganization which is in the best interest of all of the Debtor's creditors. *See In re Foster Mortgage Corp.*, 68 F.3d 914, 917 (5th Cir 1994); *In re General Homes Corp.*, 181 B.R. 898,901 (Bankr. S.D. Tex. 1995).

**B.    Executory Contracts.**

The Reorganized Debtor by the Confirmation Order will assume the Executory Contracts as scheduled on **EXHIBIT B**. Unless expressly listed on **EXHIBIT B** as an Executory Contract being assumed by the Reorganized Debtor, all other Executory Contracts are deemed rejected by the Reorganized Debtor. Except as otherwise agreed to by the parties to the applicable Executory Contract, the Reorganized Debtor shall cure any and all undisputed defaults under any

20

Executory Contract assumed by the Reorganized Debtor pursuant to the Plan in accordance with section 365(d) of the Bankruptcy Code except that any payment due from the Reorganized Debtor to cure said undisputed default shall be paid on the earlier of March 31, 2011 or the MUD-381 Tranche One Reimbursement Payment Date or as otherwise may be agreed to by the parties.

All disputed defaults that are required to be cured shall be cured either within thirty (30) days of entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto, or as otherwise may be agreed to by the parties.  However, in no case shall a payment pursuant to a disputed default be paid before the earlier of March 31, 2011 or the MUD-381 Tranche One Reimbursement Payment Date.

## ARTICLE VI.

### ACCEPTANCE OR REJECTION OF THE PLAN

**A.      Voting Classes.**

Each holder of a Claim in Classes 1, 2, 3, and 4 shall be entitled to vote to accept or reject the Plan. Each holder of a Partnership Interest in Class 5 shall be deemed to have rejected the Plan.

**B.      Voting Rights of Holders of Disputed Claims and Disputed Interests.**

Pursuant to Bankruptcy Rule 3018(a), a Claim or Partnership Interest that is Disallowed or which is disputed or objected to will not be counted for purposes of voting on the Plan to the extent it is disputed, unless the Court enters an order temporarily allowing the Claim or Partnership Interest for voting purposes under Bankruptcy Rule 3018(a).  Such disallowance for voting purposes is without prejudice to the claimant's or interest holder's right to seek to have its

Claim or Partnership Interest, as the case may be, allowed for purposes of distribution under the Plan.

### C.      Acceptance by Impaired Classes.

An impaired class of Claims shall have accepted the Plan if (a) the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Claims actually voting in such class have voted to accept the Plan, and (b) more than one-half in number of the holders (other than any holder designated under section 1126(e) of the Bankruptcy Code) of such Claims actually voting in such class have voted to accept the Plan.

### D.      Nonconsensual Confirmation.

In the event that any Class of Claims fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtor requests that the Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code.

## ARTICLE VII.

## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

### A.      Notice of Occurrence of Effective Date

The "Effective Date" of this Plan shall be 14 days after the Confirmation Order becomes a Final Order.  The Reorganized Debtor shall File with the Court a notice of the occurrence of the Effective Date within two Business Days of the occurrence of the Effective Date.

Notwithstanding any other provision of this Plan, the Effective Date shall not occur until the following conditions have been either satisfied or waived by the Debtor or the Reorganized Debtor (or will be satisfied or waived contemporaneously with the occurrence of the Effective

Date):  (1) the Confirmation Order, in form and substance satisfactory to the Debtor or the Reorganized Debtor and LVH Pearville shall have become a Final Order and not subject to appeal; (2) the Exit Financing contemplated by the Plan which is due to have been paid on the Effective Date shall have been funded to the Debtor; and (3) the IBC Settlement obligations have been fulfilled.

From and after the Effective Date, any Person who desires notice of any pleading or document filed in the Reorganization Case, or of any hearing in the Court, or of any matter as to which the Bankruptcy Code requires notice to be provided, shall file a request for post-confirmation notice and shall serve the request on counsel for the Debtor; provided however, the United States Trustee shall be deemed to have requested post-confirmation notice.

### B.    Vesting of Assets and Operations of Property.

All property of the estate and the Property shall be transferred to the Reorganized Debtor on the Effective Date. On the Effective Date, pursuant to the Plan and the Confirmation Order, any receiver, custodian or similar person or entity appointed prior to the Effective Date for the Debtor or any of its property shall be terminated and discharged from its responsibilities and duties and all property, including Cash, of the Debtor held by such receiver, custodian or similar person or entity shall be immediately turned over to the Reorganized Debtor, without setoff or offset.

### C.    Means to Implement the Plan.

The Reorganized Debtor shall make all distributions required under the Plan.

### D.    Means for Funding the Plan.

The Reorganized Debtor shall make all distributions required under the Plan out of the Exit Financing.

E.    **Objections to Claims/Administrative Claims/Interests.**

1.    **Objections to Claims or Interests; Prosecution of Disputed Claims or Disputed Interests.**

LVH Pearville as a joint-proponent of the Plan, or the Reorganized Debtor shall have the exclusive right to object to the allowance, amount or classification of Claims or Interests asserted in the Reorganization Case, and such objections may be litigated to Final Order by LVH Pearville acting on behalf of the Reorganized Debtor.   Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Claims or Interests shall be filed no later than ninety days after the Effective Date, subject to any extensions granted pursuant to a further order of the Bankruptcy Court.   Such extensions may be obtained by LVH Pearville upon ex parte motion.

2.    **Estimation of Disputed Claims.**

The Debtor, and after the Effective Date, the Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate for all purposes, including distribution under this Plan, any Disputed, contingent or unliquidated Claim or Interest pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtor or the Reorganized Debtor have previously objected to such Claim or Interest.  The Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest at any time, including, without limitation, during the pendency of an appeal relating to such objection.

3.    **No Distribution on Account of Disputed Claims.**

No Distribution shall be made with respect to all or any portion of any Disputed, contingent, or unliquidated Claim or Interest until the entire Claim or Interest becomes an Allowed Claim or an Allowed Interest.  The Reorganized Debtor shall set aside or reserve a

24

portion of the consideration payable to the holders of Allowed Claims and Allowed Interests in a particular Class to be held in the Disputed Claims or Disputed Interests reserve for such Class in an amount sufficient to pay to the holders of all Disputed Claims or Disputed Interests in such Class the full distributions they may be entitled to if their respective Claims or Interests were allowed in full.

### F.  Disputed Claims.

Pending resolution of a Disputed Claim, all Cash to be distributed to the holder of the Disputed Claim shall be placed in a segregated bank account at a federally insured financial institution and maintained by Reorganized Debtor until distribution to the holder of such Claim under the Plan.  Distribution shall be made only from the Disputed Claims reserve and only at such time as a particular Claim is determined to be an Allowed Claim.  The holder of a Disputed Claim that is ultimately allowed shall have no recourse against the Reorganized Debtor or its property for the payment of its Allowed Claim.  No interest shall accrue or will be paid with respect to any Disputed Claim for the period from the Effective Date to the date a distribution, if any, is made with respect to said Disputed Claim upon becoming an Allowed Claim.  To the extent that a Disputed Claim ultimately is disallowed or allowed in an amount less than the amount of the reserves for such Disputed Claim, any resulting surplus in the reserve shall be transferred from the reserve to the Reorganized Debtor.

### G.  Effect of Confirmation.

Upon the happening of the Effective Date, the effect of Confirmation shall be set forth in 11 U.S.C. § 1141.

### H.  Retention of Jurisdiction.

After Confirmation of the Plan and occurrence of the Effective Date, in addition to

jurisdiction which exists in any other court, the Bankruptcy Court will retain such jurisdiction as is legally permissible including for the following purposes:

1.    To resolve any and all disputes regarding the operation and interpretation of the Plan and the Confirmation Order;

2.    To determine the allowability, classification, or priority of claims and interests upon objection by the Debtor, Reorganized Debtor, or by other parties in interest with standing to bring such objection or proceeding;

3.    To determine the extent, validity, and priority of any lien asserted against property of the Reorganized Debtor or property of the Estate except as to liens asserted against the Property which have been assumed or discharged pursuant to this Plan;

4.    To construe and to take any action to enforce the Plan, the Confirmation Order, and any other order of the Bankruptcy Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, and the Confirmation Order and all matters referred to in the Plan and the Confirmation Order, and to determine all matters that may be pending before the Bankruptcy Court in this Reorganization Case on or before the Effective Date with respect to any person or entity;

5.    To determine (to the extent necessary) any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Effective Date;

6.    To determine any other request for payment of administrative expenses;

7.     To resolve any dispute regarding the implementation, execution, performance, consummation, or interpretation of the Plan and the Confirmation Order;

8.     To determine motions for the rejection, assumption, or assignment of executory contracts or unexpired leases Filed before the Effective Date and the allowance of any claims resulting therefrom;

9.     To determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the Reorganization Case whether before, on, or after the Effective Date;

10.    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

11.    To modify the Plan under section 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose;

12.    Except as otherwise provided in the Plan or the Confirmation Order, to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan and the Confirmation Order or the execution or implementation by any person or entity;

13.    To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

14.    To enter a final decree closing the Reorganization Case; and

15.    To issue such orders in aid of consummation of the Plan and the Confirmation Order, notwithstanding any otherwise applicable non-bankruptcy

law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules.

### I.    Successors and Assigns.

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, or assigns of such entity.

### J.    Amendment, Modification, and Severability.

1.    This Plan may be amended or modified before the Effective Date by the Debtor to the extent provided by section 1127 of the Bankruptcy Code.

2.    The Debtor reserves the right to modify or amend the Plan upon a determination by the Bankruptcy Court that the Plan, as it is currently drafted, is not confirmable pursuant to section 1129 of the Bankruptcy Code to the extent such a modification or amendment is permissible under section 1127 of the Bankruptcy Code without the need to resolicit consents, and the Debtor reserves the right to sever any provisions that the Bankruptcy Court finds objectionable.

### K.    Delivery of Distributions and Deliverable or Unclaimed Distributions.

#### 1.    Delivery of Distributions in General.

Except as provided below for holders of undeliverable distributions, distribution to holders of Allowed Claims shall be distributed by mail as follows:

a.    At the addresses set forth on the respective proofs of claims of such holders; or

b.    At the addresses set forth in any written notices of address, changes

28

delivered to the Reorganized Debtor after the date of any related proof of claim; or

        c.      At the address reflected on the Schedules if no proof of claim or proof of interest is Filed and the Reorganized Debtor has not received a written notice of change of address.

### 2.      Undeliverable Distributions.

In the event any payment to a holder of a Claim under the Plan remains unclaimed for a period of six (6) months after such distribution has been made (or after such delivery has been attempted), such Unclaimed Distribution and all future distributions to be made to such holders shall be deemed forfeited by such holder and any such distributions retained by the Reorganized Debtor. No provision contained in this Section or elsewhere in the Plan shall be interpreted to require the Reorganized Debtor to attempt to locate any such Person.

        a.      **Fractional Cents.**  Any other provision of the Plan to the contrary notwithstanding, no payments of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent (rounding down in the case of .5).

        b.      **No Cash Payments of $5.00 or Less on Account of Allowed Claims**. If a cash payment otherwise provided for by this Plan with respect to an Allowed Claim would be less than Five Dollars ($5.00) (whether in the aggregate or on any payment date provided in this Plan), notwithstanding any contrary provision of this Plan, no such payment will be made and the Reorganized Debtor shall retain such funds for its own purposes.

### L.      Claims Against Others.

Although some insiders received distributions within the applicable avoidance period, the Debtor will not pursue these actions since creditors are being paid in full under the Plan.

The Debtor has not conducted a complete analysis of other avoidance claims arising under the Bankruptcy Code. The Debtor does not believe that it will pursue any Avoidance Actions.

### M.   Retention of Claims and Causes of Action.

Except to the extent any rights, Causes of Action, defenses, and counterclaims are expressly and specifically released in connection with this Plan or in any settlement agreement approved during the Reorganization Case: (i) any and all Retained Causes of Action accruing to the Debtor or the Estate shall remain assets of and vest in the Reorganized Debtor, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such Retained Causes of Action have been listed or referred to in the Plan, the Disclosure Statement, or any other document filed with the Court, and (ii) neither the Debtor, the Estate, nor the Reorganized Debtor waive, release, relinquish, forfeit, or abandon (nor shall they be estopped or otherwise precluded or impaired from asserting) any Retained Causes of Action that constitute property of the Debtor or the Estate: (a) whether or not such Retained Causes of Action have been listed or referred to in this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, (b) whether or not any such Retained Causes of Action are currently known to the Debtor, and (c) whether or not a defendant in any litigation relating to any such Retained Causes of Action Filed a proof of Claim or Partnership Interest in the Reorganization Case, Filed a notice of appearance or any other pleading or notice in the Reorganization Case, voted for or against this Plan, or received or retained any consideration under this Plan. Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose,

describe, identify, analyze or refer to any Retained Causes of Action, or potential Retained Causes of Action, in the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the Debtor's or the Reorganized Debtor's right to commence, prosecute, defend against, settle, recover on account of, and realize upon any Retained Causes of Action that the Debtor or its Estate have or may have as of the Effective Date.

The Debtor expressly reserves all Retained Causes of Action for later adjudication by the Reorganized Debtor, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Retained Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order.  In addition, the Reorganized Debtor expressly reserves the right to pursue or adopt Retained Causes of Action that are alleged in any lawsuits in which the Debtor is a defendant or an interested party, against any Person or Governmental Entity, including the plaintiffs or co-defendants in such lawsuits.

Any Person or Governmental Entity to whom the Debtor has incurred an obligation (whether on account of services, purchase, sale of goods or otherwise), or who has received services from the Debtor, or who has received money or property from the Debtor, or who has transacted business with the Debtor, or who has leased equipment or property from or to the Debtor should assume that such obligation, receipt, transfer or transaction may be reviewed by the Debtor or the Reorganized Debtor subsequent to the Effective Date and maybe the subject of an action after the Effective Date, whether or not: (a) such Person or Governmental Unit has Filed a proof of Claim or Interest against the Debtor in the Reorganization Case; (b) such

31

Person's or Governmental Unit's proof of Claim or Interest has been objected to by the Debtor; (c) such Person's or Governmental Unit's Claim or Interest was included in the Debtor's Schedules; or (d) such Person's or Governmental Unit's scheduled Claim or Interest has been objected to by the Debtor or has been identified by the Debtor as contingent, unliquidated or disputed.

### N.    No Waiver of Claims.

Neither the failure to list a Claim in the Schedules filed by the Debtor, the failure of the Debtor or any other Person to object to any Claim for purposes of voting, the failure of the Debtor or any other Person to object to a Claim, Partnership Interest or Administrative Claim before Confirmation or the Effective Date, the failure of any Person to assert a Claim or Cause of Action before Confirmation or the Effective Date, the absence of a proof of Claim or Partnership Interest having been filed with respect to a Claim or Partnership Interest, nor any action or inaction of the Debtor or any other Person with respect to a Claim, Partnership Interest, or Administrative Claim, other than a legally effective express waiver or release shall be deemed a waiver or release of the right of the Debtor or the Reorganized Debtor before or after solicitation of votes on the Plan or before or after Confirmation or the Effective Date to (a) object to or examine such Claim, Partnership Interest or Administrative Claim, in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any Claim or Cause of Action against the holder of any such Claim.

### O.    Notices Under the Plan.

Notices, requests, or demands with respect to this Plan shall be in writing and shall be deemed to have been received within five (5) days of the date of mailing, provided they are sent by registered mail or certified mail, postage prepaid, return receipt requested, and if sent to the

Debtor, addressed to:

> Spencer Crain Cubbage Healy & McNamara, pllc
> Thomas H. Grace
> 1330 Post Oak Blvd., Suite 1600
> Houston, TX 77002

### P. Withholding Taxes/Setoffs.

The Reorganized Debtor shall be entitled to deduct any Federal or State withholding taxes from any payments with respect to Allowed Claims for wages of any kind. The Reorganized Debtor may, but shall not be required to, set off or recoup against any Claim, and the payments to be made pursuant to the Plan in respect of such Claim, any claims of any nature whatsoever the Debtor or the Estate may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such claim the Debtor may have against such holder.

### Q. Term of Injunctions or Stays.

Unless otherwise provided, all injunctions or stays arising before the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date, or such later date as provided under applicable law.

### R. Exemption from Certain Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer (including the filing and/or recording of any and all documents, liens, security interests or other documents in connection with or related to secured claims or the assumption or modification thereof pursuant to this Plan) or of cancellation and/or releases of any liens or security interests will not be subject to any

33

stamp tax or similar tax to the fullest extent authorized by section 1146(a) of the Bankruptcy Code, or otherwise.

### S.      Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of **the State of Texas** (without reference to its conflict of law rules) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specifically provided in such agreements, documents, or instruments.

Dated: November 23, 2010

Pearville, L.P., a Texas Limited Partnership

By:  JEFCO Development Corporation, a Texas
Corporation, General Partner

By:  _____
        James E. Fisher, Jr.
        President, JEFCO Development Corporation

LVH Pearville LLC, a Texas Limited Liability Company
(to be formed)

By:  LVH Pearville LLC

By:  _____
        Reuven M. Bisk
        Proposed Manager, LVH Pearville LLC

35

## EXHIBIT D-2: PARTNERSHIP STRUCTURE

JEFCO Development Corp. General Partner

Maverick Real Estate Investments, L.L.C. A Louisiana limited liability company Limited Partner

Debtor Pearville, L.P., a Texas limited partnership

# EXHIBIT D-3: TERM SHEET

(NEXT PAGE)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 10-34074 |
| | § | |
| PEARVILLE, L.P. | § | Chapter 11 |
| | § | |
| Debtor. | § | |

### TERM SHEET

This agreement (the "Agreement") is made among Pearville, L.P. ("Pearville"), International Bank of Commerce ("IBC"), Paul J.A. Van Hessen ("Van Hessen") and LVH Pearville LLC ("LVH")(collectively, the "Parties").

The Parties have conducted negotiations in an effort to reach an agreement as to financing, the settlement of adversary proceeding No. 10-03279, the nature, extent and validity of liens, and the sale of a certain note held by IBC. The terms of the settlement are set forth below:

1.  Purchase of Note. Van Hessen (through an entity controlled by Van Hessen, if desired) shall purchase IBC's $8,400,000 Note for $7,776,000 in cash (the "Note Purchase Consideration").

    1.1.  The $8,400,000 Note. IBC's $8,400,000 Note consists of:

        1.1.1.  That certain Real Estate Lien Note executed by Pearville payable to the order of International Bank of Commerce ("IBC") dated September 6, 2006 in the original amount of $8,400,000.00, as the same may be amended, renewed or rearranged from time to time (the "$8,400,000 Note").

            1.1.1.1.  As of September 1, 2010 the balance on the $8,400,000 Note including interest and late fees but not legal fees is $9,295,143.92. Interest continues to accrue at $4,142.60 per day.

2.  Assignment of Note. The $8,400,000 Note and all collateral and loan documents related thereto shall be assigned to Van Hessen at Closing. IBC shall make no representation or warranty, express or implied, regarding the loan documents associated with the $8,400,000 Note, other than that IBC is the owner and holder of the $8,400,000 Note and the loan documents related thereto, IBC has the authority to enter into the proposed transaction, and as to the then current outstanding balance of the $8,400,000 Note. Except as provided for herein, the Parties acknowledge that the PAD Sites are not collateral for the $8,400,000 Note or any other obligations owed to IBC other than the $7,600,000 Note as described

below and to the extent the PAD Sites are collateral for the $8,400,000 Note or any other obligations owed to IBC other than the $7,600,000 Note as described below, such security interest(s) shall be released upon closing of the sale of the $8,400,000 Note. IBC agrees to execute such other documents reasonably necessary to affect such release.

3.     <u>Indemnification of Settlement</u>.   Van Hessen shall indemnify and hold harmless IBC for any judgment, settlement or payments made to Tribble & Stephens in satisfaction of Adv. No. 10-03275 (the "<u>Tribble & Stephens Litigation</u>") or other claims made by Tribble & Stephens or its successors or assigns, including but not limited to Van Hessen or its agent, against IBC associated with the Retail Center (the "<u>Tribble & Stephens Settlement</u>"). IBC will use its reasonable efforts to assist in resolving Adv. No. 10-03275 for the lowest dollar amount. IBC may not settle Adv. No. 10-03275 without LVH's consent which may not be unreasonably withheld. Van Hessen agrees to grant IBC a personal guarantee for payment of the Tribble & Stephens Settlement.

4.     <u>Settlement of PAD Site Litigation, Adversary Proceeding No. 10-03279</u>. For payment of $850,000 (the "Settlement Payment") to IBC by Van Hessen, Adversary Proceeding Number 10-03279 will be dismissed with prejudice, and each party shall bear its own fees, costs and expenses. The Settlement Payment shall be evidenced by a promissory note (the "<u>Settlement Note</u>") in the amount of $850,000 from Van Hessen and/or any entity holding title to the PAD Sites payable to the order of IBC, due and payable on or before December 31, 2010. The Settlement Note shall bear no interest prior to default, and subsequent to default shall bear interest at the maximum non-usurious rate allowed by applicable law. The Settlement Note and the obligation to fund the Tribble & Stephens Settlement shall be secured by a first lien deed of trust (the "<u>Settlement Deed of Trust</u>") covering the PAD Sites (as such term is defined in Section 5 hereof). Upon payment in full of the Settlement Note and IBC obtaining a full and final release of the Tribble & Stephens Litigation, IBC will release all liens it has covering the PAD Sites and discharge the $7,600,000 Note.

4.1     <u>The $7,600,000 Note</u>. IBC's $7,600,000 Note consists of:

    4.1.1     That certain real estate lien note executed by Pearville payable to the order of IBC dated August 17, 2004 in the original principal amount of $7,600,000, as the same may be amended, renewed or rearranged from time to time (the "<u>$7,600,000 Note</u>").

       4.1.1.1.     As of September 1, 2010 the balance on the $7,600,000 Note including interest and late fees but not legal fees is $550,804.14. Interest continues to accrue at $246.53 per day.

5.   Taxes.  LVH will cause all ad valorem taxes due and owing on Pearville's property (the "Property") and the two vacant tracts of land of approximately 2 acres each located at Pearland Boulevard and Beltway 8 and made the subject of Adversary Number 10-03279 (the "PAD Sites,"), to be paid in full.  Van Hessen hereby assumes the obligation to pay those taxes.

6.   Mutual Releases.  Van Hessen, LVH, Pearville and IBC will enter into mutual releases in forms to be agreed to.  Mutual releases will be executed at Closing and held in trust by IBC's counsel until IBC's receipt of the Settlement Payment and dismissal of the Tribble & Stephens Litigation respectively.  Each party will be responsible for its own fees and expenses, including attorney's fees (including but not limited to those fees covered by Porter & Hedges' proof of claim), incurred in connection with the herein described promissory notes, the Pearville bankruptcy and the transactions contemplated herein.

7.   Contingencies.  There will be no financing contingencies.  The Agreement will be funded in cash by Van Hessen.  Van Hessen, or his designee, shall provide reasonable proof of his ability to close the transaction to IBC within 10 days of execution of this Agreement and deposit cash in an escrow account not less than 5 days prior to Closing, the Final Payment, or a hearing on the 9019 Motion or confirmation of the Plan, as applicable pursuant to the terms of this Agreement.

8.   Closing Date.  Subject to the provisions of Section 8.5 hereof, Closing shall occur on or before the 10th day after the date hereof or on the date upon which all Conditions to Closing are satisfied (the "Closing" or "Closing Date").  At Closing, the Note Purchase Consideration shall be paid in good funds, and the Settlement Note and Settlement Deed of Trust will be executed.

8.5  Final Payment.  The Settlement Payment will be made on the earlier of (i) the date on which Van Hessen receives payment from Commonwealth Land Title Insurance Co. on account of IBC's alleged lien on the PAD Sites or (ii) December 31, 2010.

9.   Conditions to Closing.  All final documents will be approved, executed and delivered.  IBC has received payment of the Note Purchase Consideration.  The Settlement Note and the Settlement Deed of Trust will have been approved and delivered.  Any dispute regarding such documents will be determined by the Bankruptcy Court.

10.  Assignment of Bonding Capacity.  LVH and Pearville agree to assign to IBC $2,000,000 of Municipal Utility District ("M.U.D.") bonding capacity assigned to Pearville from Harris County M.U.D. No. 381 to be used on the property formerly owned by Pearville-Hope.  LVH and Pearville agree to use their best efforts to properly document the assignment and to work with the proper M.U.D. authorities to properly document the assignment.  Neither LVH or Pearville will take any action to impair or decrease the amount of bonding capacity being assigned herein

other than to request reimbursement of improvements already constructed or on which construction has commenced prior to the date hereof. The assignment will be provided for in the Plan. LVH, Pearville, Van Hessen and IBC agree to support and only support a Plan which, to the extent necessary, carries the terms and conditions of this agreement into full force and effect.

11.  Binding Nature of Agreement. This Agreement is intended as a binding agreement containing the material terms of the proposed transaction and does not purport to summarize all of the terms and conditions that may be determined by any party to be appropriate for such transaction. This Agreement is confidential. The provisions of the final terms of agreement shall be included in the final documents [the Plan or 9019 Motion] if necessary, and, as negotiated and approved, shall be binding on the Parties and their respective successors or assigns.

12.  Notices. Any notices shall be sent to all other Parties hereto.

13.  Governing Law. This Agreement shall be governed by the laws of the State of Texas and the United States Bankruptcy Code.

14.  Execution of this Agreement. This Agreement may be executed in one or more counterparts each of which shall be deemed an original but all of which when taken together shall constitute but one and the same Agreement. This agreement shall be binding on all other signatories notwithstanding the failure of Pearville to execute a copy hereof.

15.  No solicitation of votes. This Agreement is NOT deemed to be a solicitation of votes in favor of the Plan.

16.  Court Approval. To the extent necessary, this agreement is subject to Bankruptcy Court Approval.

17.  Budget. Promptly upon execution hereof, IBC will approve an October budget for Pearville in substantially the same form as the September budget previously approved.

18.  Extension of Deadlines. The deadlines and dates set forth in this Agreement may be extended if agreed to by the Parties in writing. Neither Pearville's consent nor signature is required to extend the deadlines and dates set forth in this Agreement to the extent that such deadlines are matters strictly between IBC, LVH and Van Hessen.

[Signatures on Following Page]

Dated: November 9, 2010


_____
Pearville, L.P.


_____
LVH Pearville, LLC, Reuven Bisk Manager


_____
Paul J.A. Van Hessen by: Reuven Bisk
Agent and Attorney in Fact


_____
International Bank of Commerce

2052912v2

_____
Pearville, L.P.


_____
LVH Pearville, LLC, Reuven Bisk Manager


_____
Paul J.A. Van Hessen by:  Reuven Bisk
Agent and Attorney in Fact


_____
International Bank of Commerce

## EXHIBIT D-4: EXECUTORY CONTRACTS TO BE ASSUMED BY REORGANIZED DEBTOR

| Counterparty | Description of Executory Contract or Lease | Estimated Cure Payment |
|---|---|---|
| Eye Styles | Tenant Lease | N/A |
| Subway Real Estate Corp. | Tenant Lease | N/A |
| Danny Vo, Dazzle Nails | Tenant Lease | N/A |
| Spec's Family Partners, Ltd. | Tenant Lease | N/A |
| SHRI Business, LLC, dba 2-A-Days | Tenant Lease | N/A |
| SprintCom, Inc. | Tenant Lease | $75,022.88 (as of January 1) $55,739.50 (as of April 1) |
| Le Petit Croissant Bakery | Tenant Lease | $25,850.00 |
| Peltier Brothers Construction LP | Construction Contract | $207,797.40 |
| Troy Construction LLC | Construction Contract | $236,222.30 |

# EXHIBIT D-5: INSIDER TRANSACTIONS

| Date | Name | Memo | Amount | |
|------|------|------|--------|---|
| 05/14/2009 | J. E. Fisher, Jr. | Management fee | (5,000.00) | |
| 06/16/2009 | J. E. Fisher, Jr. | Management fee | (3,000.00) | |
| 06/30/2009 | J. E. Fisher, Jr. | Management fee | (10,000.00) | |
| 08/18/2009 | J. E. Fisher, Jr. | Management fee | (10,000.00) | |
| 09/04/2009 | Jefco | Management fee | (3,000.00) | |
| 10/08/2009 | Jefco | Management fee | (6,600.00) | |
| 01/27/2010 | Jefco | Management fee | (6,600.00) | |
| 02/26/2010 | Jefco | Management fee | (6,600.00) | |
| 03/02/2010 | Jefco | transfer 03/02/10 from proceeds deposited 03/01/10 | (5,000.00) | * |
| 03/03/2010 | J. E. Fisher, Jr. | transfer 03/03/10 from proceeds deposited 03/01/10 | (40,000.00) | * |
| 03/03/2010 | Megan Conley | transfer 03/03/10 from proceeds deposited 03/01/10 | (75,000.00) | * |
| 04/09/2010 | Jefco | Management fee | (6,600.00) | |
| 04/30/2010 | Jefco | Management fee | (6,600.00) | |

* These transactions wnet through the Debtor's bank account but were not paid using Debtor's funds.